[Crim. No. 22263. Oct. 15, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
OSCAR GATES, Defendant and Appellant.

COUNSEL

Judd C. Iversen, under appointment by the Supreme Court, and Madeline McDowell for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Edward P. O'Brien, Assistant Attorney General, Ronald Smetana, Ronald E. Niver, Karl S. Mayer and Eugene W. Kaster, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PANELLI, J.—Defendant was convicted of the first degree murder of Lonnie Stevenson (Pen. Code, § 187)[1] with findings of use of a firearm and being on parole at the time of the offense (§§ 12022.5, 1203.08); assault with a deadly weapon on Maurice Stevenson with findings of use of a firearm and infliction of great bodily injury (§§ 245, 12022.5, 12022.7); robbery of Lonnie Stevenson with findings of use of a firearm, infliction of great bodily injury, and being on parole (§§ 211, 12022.5, 12022.7, 1203.08); robbery of Maurice Stevenson with findings of use of a firearm, great bodily injury and

---

[1] Unless otherwise noted, all statutory references hereafter are to the Penal Code.

being on parole (§§ 211, 12022.5, 12022.7, 1203.08); possession of a concealable firearm by an ex-felon (§ 12021); and escape with force and violence (§ 4532, subd. (b)). A special circumstance allegation under the 1978 death penalty law was found true: that the murder was committed while the defendant was engaged in the commission or attempted commission of robbery. (§ 190.2, subd. (a)(17)(i).) The jury fixed the punishment at death; the appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

For reasons set forth hereafter, we affirm the judgment in its entirety.

## I. GUILT PHASE

### A. FACTS

#### 1. *Prosecution Case.*

On December 10, 1979, defendant shot Maurice Stevenson and Lonnie Stevenson, Maurice's uncle. Lonnie died, and Maurice survived. There was no question that defendant did the shooting; there was a question, however, as to how and why the shooting occurred.

Maurice Stevenson was the principal prosecution witness. He testified as follows: He and his uncle Lonnie were waxing his car in front of his grandfather's house in Oakland on December 10, 1979, when defendant appeared about 3:30 p.m., holding a gun with the trigger cocked. Defendant said something like, "I got you," and told them to go to the side of the house. He ordered them to put their hands on the wall and to empty their pockets and take off their jewelry. Maurice had two diamond rings, a diamond watch and $200, all of which he dropped on the ground behind him. Lonnie also took off a ring and dropped it behind him. Defendant then patted them down and asked Maurice where his father James Stevenson was. When Maurice said he did not know, defendant told them he was going to kill them. He shot Lonnie, who yelled and started running toward the back of the house, screaming, "My daddy, my daddy. Fred is out here shooting us." Defendant then shot Maurice. As Maurice was falling, he saw defendant pick up the jewelry and money and run toward the street. Maurice crawled into the house where he saw Lonnie on the floor, bleeding and unconscious. He told his grandfather that "Fred" had shot them.[2]

The police arrived two to three minutes later. Maurice talked to them while they waited 20 to 25 minutes for the ambulance. He also talked to the

---

[2] Maurice knew defendant as "Fred Gates" and "Kojac."

police at the hospital after his surgery and gave a short tape-recorded statement.[3]

Maurice identified as his a ring found by the police on the ground near the house. He said he had known defendant for about a year and that defendant had lived with him, his uncle and his father for a few months. Maurice had not seen defendant for six or seven months before the shooting and had had no disagreements with defendant. His uncle had had an argument with defendant, but Maurice had not been present. Maurice said he and his family had gotten along pretty well with defendant and that this incident came as a complete surprise. At other points, however, Maurice referred to threats by defendant against his family.

On cross-examination, defense counsel asked Maurice a number of questions relating to the existence of a forgery ring headed by Maurice's father and defendant's involvement in it. Maurice was also asked whether there had been a disagreement about defendant's "cut" and whether defendant claimed money was owed him. Maurice consistently denied knowledge of such activities or claims.

Jimmy Stevenson, Maurice's grandfather, said that he was working in his backyard on the afternoon of December 10. Between 3 and 4 p.m., he heard some loud noises and his son Lonnie yell, "Daddy, Fred done shot us." He ran into the house and got his .22 rifle, but by the time he got to the front, defendant was gone, and only defendant's hat remained about 25 to 30 feet from the house.

Some time after the shooting, defendant called Jimmy and said he had killed Lonnie and shot Maurice. He further indicated he was going to go to Los Angeles and start killing members of another family and upon his return would finish killing the rest of the Stevensons.

Raymond Lewis, a neighbor of Jimmy Stevenson, was working on his car in front of his house on December 10. He saw Maurice and Lonnie working on a car and then noticed they were gone. He heard three gunshots and then saw a Black male of stocky build, about five feet, seven or eight inches tall, wearing blue jeans, a white jacket and a knit hat, run from the area of the Stevenson driveway. He saw the man put a gun in his pocket.

Another neighbor, Eugene Williams, was bringing his children home from school when he saw a stocky Black male wearing an off-white or beige

---

[3] Maurice had surgery to treat his lung that had collapsed from the bullet wound. The bullet was lodged in his left lateral lung.

hat pull a gun on Lonnie and Maurice Stevenson as they were wiping the car. He saw them go to the front of the car while the man patted them like he was getting ready to frisk them.[4] The man then walked them over to the side of the house and started frisking them and having them take off their watches, rings and other things. Both Lonnie and Maurice had their hands up in the air and their backs to the man, whom Williams identified as defendant. Williams went inside his house and called the police. While he was on the phone he heard three to four shots.

Officer Moschetti arrived at the Stevenson house within five to eight minutes after he heard the police broadcast at 4 p.m. Maurice told him that Fred Gates had shot them; that Fred had approached, drawn a gun, herded him and Lonnie over to the side of the house where he frisked them, robbed them, and shot them in the back.

Police found a palm print on the wall at the side of the Stevenson house that was made by Maurice Stevenson. They also found a man's ring and a .38 caliber projectile with blood on it in the driveway.

The autopsy of Lonnie revealed that he had been shot in the back. The bullet passed all the way through his body. The angle of the bullet wound was consistent with his having been bent slightly forward when shot.

Defendant was arrested in Vallejo on December 29, 1979. He told the officers his name was Alfred Filds and produced identification in that name. He was armed with a gun at the time of his arrest. This gun was found to be the one used to kill Lonnie Stevenson.

2. *Defense Case.*

Defendant testified extensively concerning the Stevenson forgery ring, his involvement in it, and the dispute over whether he was owed a "cut" from the forgery proceeds:

Defendant met the Stevensons through his friend Donald "Duck" Taylor. In January 1979, defendant moved into an apartment on Hillside in Oakland with James Stevenson, Maurice Stevenson, Lonnie Stevenson and Duck Taylor. (James was Lonnie's brother and Maurice's father.) He joined the forgery ring which James and Duck had put together. They would file fictitious business statements, open business accounts in banks, deposit stolen checks into them, and then withdraw the money. Other schemes

---

[4] In his first statement to the police shortly after the shooting, Williams did not mention seeing any frisking-type activity in front of the car.

included false backdating of bank passbooks and the use of bank insiders to enter deposits for accounts on the bank's computers and then erase them once the money had been withdrawn from the account.

James Stevenson and Duck Taylor were the brains of the operation. The core members of the so-called Stevenson forgery ring were James, Lonnie and Maurice Stevenson, Duck Taylor, Melvin Hines and defendant. Maurice and Lonnie were "drivers," taking "walkers" from bank to bank to cash checks. Melvin Hines was also a "driver" and occasionally would go into banks himself. Defendant's role was to stay at the apartment to receive stolen checks from people and to act as a contact person.

Each participant received a "cut." James and Duck got the largest cut. The person who brought in the stolen check would get 10 to 15 percent, the driver 10 percent, and the walkers 15 to 20 percent. Defendant, Melvin Hines and Lonnie would then get their cuts, which were generally between $200 to $300 per transaction. There was also a plan for each core member in turn to receive a big cut of about $25,000. Defendant was to get his big cut after Maurice and Lonnie got theirs. This was to have been around September of 1979.

In the spring, defendant moved out of the Hillside apartment and into an apartment on Fairmount with Duck Taylor and his girlfriend. In September 1979 defendant discovered he was not receiving his share of the money distribution. He, James, Lonnie and Melvin Hines had a heated discussion about it at the Fairmount apartment. The next morning defendant encountered James, Duck, Maurice and Melvin in front of the apartment building. James had a gun. James said, "Hey man, the money thing . . . that is dead." Defendant kept talking loudly to attract attention. The manager told them to break it up, and others looked out their windows. Defendant kept backing away and then zigzagged between cars. James and Maurice began shooting; defendant was hit in the leg, fell, got up and eventually made it to a friend's apartment. The friend talked defendant into going to the hospital where defendant gave the name of Alford Filds and told police he had been shot while jogging.[5]

After the shooting, defendant went to stay with friends in Vallejo and Sacramento. Through various intermediaries, defendant talked to members of the Stevenson family; he was told that Lonnie had said he would have to give up his claim to the money or be shot.

On December 10, defendant spoke with Lonnie by phone and arranged to meet him at noon at a store near Jimmy Stevenson's house to be paid the

---

[5] Defendant gave an incorrect spelling of his alias "Alfred Filds" at the hospital.

money he was owed. Defendant went there and met Lonnie who explained that he did not yet have the money. Lonnie suggested that they meet about 3 p.m. at his father Jimmy's house.

Defendant returned at 3 p.m. He parked his car near the store around the corner from Jimmy Stevenson's house. As he walked toward the Stevenson house, he saw Lonnie and Maurice out in front waxing a car. Defendant said he had come to pick up his money, and they answered that they would have to go into the house to get it. Defendant showed them a gun and said that although he did not want any trouble, he could take care of himself. When they headed for the house, Lonnie led them away from the front door and down the side of the house. When defendant asked why, Lonnie said the carpet had been shampooed and they would have to use the back door. As they passed a pickup truck in the driveway, Maurice stepped to the side as if to get behind defendant, who then expressed concern about what was happening. Maurice volunteered that he did not have a gun and put his hands up on the wall, saying that defendant could search him. Defendant pat-searched him, and then Lonnie put his hands in the air, and defendant pat-searched him as well. Neither had a gun.

As they started down the driveway again, defendant saw Jimmy Stevenson coming from the back with a gun. Defendant "hollered something," ducked down and pulled his gun. Maurice grabbed for defendant's arm. Defendant pushed him against the house and started shooting at Jimmy Stevenson. Defendant slammed Maurice into the chimney and shot him in the back.

Defendant admitted that he had told the police a different story after his arrest. At that time, he had denied shooting Maurice and Lonnie. He said he lied because he did not want to admit he went over there carrying a gun. He admitted that he may have also said Lonnie had a gun, that he took the gun away from Lonnie and then shot Lonnie and Maurice.

Defendant admitted phoning Jimmy Stevenson after the shooting, but he denied saying that he was going to kill the rest of his family.

Defendant's testimony about the shooting incident in September was corroborated by a janitor of the apartment building and another resident. The janitor remembered that the argument had been about "some money that they owed Mr. Gates [defendant] that they wouldn't pay." Further corroboration was given by Dr. Burkhart who had treated a man by the name of Alford Filds for a gunshot wound in the right leg about 12:30 p.m. on September 14, 1979.

### 3. *People's Rebuttal.*

The prosecution called Melvin Hines as a rebuttal witness. Hines was on parole from a forgery term. He had been involved in "bank games" with James Stevenson for about seven or eight years. In 1979, Hines, James and Lonnie Stevenson and Duck Taylor were involved in a forgery ring. Hines met defendant in early 1979. In August 1979, their operation had a big haul and took in about $80,000. Though defendant was not involved in the operation, he got about $2,000 to $3,000 because he was "an associate of Duck's" and "whatever Donald said to do he did."

In August 1979, there was an argument at the Fairmount apartment, and defendant threatened to kill Hines and Lonnie. Only defendant, Hines and Lonnie were there. Defendant pulled a knife out of his sock and threatened both Lonnie and Hines because he thought they were receiving more money than he was. Defendant said he would kill other members of the Stevenson family unless he got more money.

Hines saw defendant in September 1979 when he went to Duck's apartment to plan another deal. He, James, and Duck met defendant outside; they asked him why he had jumped on Lonnie and pulled a knife on Hines. Defendant said he wanted to kill them so he could get a bigger cut. Both defendant and Hines had guns, as did the others. Defendant pulled out his gun and said he wanted $10,000. They said no, that he didn't deserve it. Defendant said he would kill everyone in the family if he did not get it. They again said no. Shooting broke out, and defendant ran.

Hines continued in the forgery ring after the September shooting incident, but defendant did not. Hines was arrested in November 1979 and linked to the forgery operation. He had not talked to the authorities about the forgery operation until the day before he testified.

### B. GUILT PHASE ISSUES

### 1. *Claim of Right.*

Defendant contends the court erred by refusing to instruct the jury on his claim-of-right defense and erred in improperly restricting defense testimony regarding this defense.

The trial court refused defendant's request for an instruction based on the claim-of-right theory set forth in *People* v. *Butler* (1967) 65 Cal.2d 569 [55 Cal.Rptr. 511, 421 P.2d 703], where the court held that "a bona fide belief, even though mistakenly held, that one has a right or claim to the

property negates felonious intent" and accordingly precludes a finding of theft or robbery. (*Id.* at p. 573.) The present case, however, is distinguishable from *Butler* in that defendant's purported "right" was based on his participation in the forgery ring, a clearly illegal endeavor. As a matter of law, one cannot have a good faith belief that he has a right to property when that "right" is rooted in a notoriously illegal transaction. (Cf. *People* v. *Poindexter* (1967) 255 Cal.App.2d 566, 570-571 [63 Cal.Rptr. 332].) A fortiori one cannot have such a belief when he actually knows the transaction on which the "right" is based is illegal. Here, defendant's asserted right is rooted in a transaction that is notoriously illegal and known to be such by defendant.

Defendant also complains about restrictions on his direct examination of Joseph Lombard regarding an argument between defendant and the Stevensons shortly before the September 14 shooting incident. Lombard was not allowed to testify about the nature of the argument or what was said, nor was he allowed to testify that defendant told him the Stevensons were cheating him.[6] Such testimony would have corroborated defendant's claim that money was owed him. The court, however, sustained the prosecutor's hearsay objection.

While defense counsel had argued the evidence was admissible under Evidence Code section 1250 to show state of mind, he never expressly articulated its relevance to his claim-of-right defense.

Based on defense counsel's explanation at the time, we cannot say that the trial court erred in finding the challenged testimony inadmissible. Moreover, any error in the ruling was harmless.

2. *Admission of Taped Statement by Maurice Stevenson.*

Defendant contends the admission of a tape recording of a statement by Maurice Stevenson was prejudicial error because it was inadmissible hearsay. The statement was taken by a police officer at the hospital about two hours after the shooting as Maurice was recovering from surgery. Defendant claims the statement did not qualify for admission under the spontaneous statement exception (Evid. Code, § 1240) or as a past recollection recorded (Evid. Code, § 1237). However, at trial, no objection was made to the introduction of this evidence. (Evid. Code, § 353.) As an alternative

---

[6]Defendant made an offer of proof that Lombard would testify that defendant, Taylor and the Stevensons were arguing about whether defendant was owed money. Lombard would also have testified that prior to the shooting in September, defendant had told him he was being cheated by James Stevenson and Taylor and that Taylor had said to end the confusion by paying defendant off.

attack, defendant urges that the failure to object constituted ineffective assistance of counsel.

The Attorney General contends that the failure to object bars consideration of the issue on appeal. ■ He also contends, however, that the failure to object does not amount to ineffectiveness of counsel. He is correct. The tape was played during the direct examination of Maurice Stevenson and during the prosecutor's closing argument. It is three minutes long and gives a brief account which is consistent with Maurice's trial testimony. In the recording Maurice said: (1) He and his uncle were waxing the car when defendant came "out of nowhere"; (2) defendant took two rings, a watch and close to $200 cash from him; (3) the gun was either a .38 or a .357; (4) defendant shot him and his uncle and then ran; (5) he had had no previous problems with defendant and did not know the reason for the shootings; (6) aside from the name Oscar Gates, defendant was also known as Kojac and Fred.

The record reveals no reason for counsel's failure to object and is thus insufficient to establish ineffectiveness of counsel. ■ To establish ineffectiveness of counsel defendant must show (1) that counsel failed to act in a manner to be expected of reasonably competent attorneys and (2) that it is reasonably probable a determination more favorable to the appellant would have resulted in the absence of counsel's failings. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].) ■ Counsel may well have had strategic reasons for raising no objection since the tape contained the same falsehood as Maurice's trial testimony regarding his ignorance of the reason for the shooting. It is also possible that counsel determined an objection would have been futile since the tape would qualify under a hearsay exception. Where, as here, "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged," and there are plausible strategic reasons for his action, the ineffectiveness of counsel claim must fail on appeal. (*People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) In any event, it is not reasonably probable that the jury would have reached a more favorable verdict had it not heard this tape recording. (*People* v. *Fosselman, supra,* 33 Cal.3d at p. 584.)

3. *Rebuttal Testimony.*

Defendant contends that the trial court erred in permitting Melvin Hines to testify as a rebuttal witness. Section 1093, subdivision 4 provides that after the prosecution and defense have offered their evidence, "The parties may then respectively offer rebutting testimony only, unless the court, for

good reason, in furtherance of justice, permits them to offer evidence upon their original case."

Relying on *People* v. *Carter* (1957) 48 Cal.2d 737 [312 P.2d 665], defendant argues that Hines's testimony about threats by defendant against other members of the forgery ring should have been presented as part of the People's case-in-chief. In *Carter* the People offered no reason why the red cap they introduced in rebuttal could not have been introduced as part of their case-in-chief. ■ We disapproved such a tactic, stating that proper rebuttal evidence is "restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt." (*Id.* at pp. 753-754.) The purpose of this restriction "is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence." (*Id.* at p. 753.)

Here, unlike *Carter,* the prosecutor explained his delay in presenting Hines's testimony. Responding to a charge of misconduct, the prosecutor stated he was unaware of the forgery connection until defense counsel's cross-examination of Maurice Stevenson. Until that time he believed the only motivation for the shooting was a possible drug deal. The prosecutor had searched CIB and FBI records for a connection between the victims and defendant and had found none.

The trial court accepted the prosecutor's explanation, and the record supports that action. None of the evils mentioned in *Carter* was present here. "Although a crucial witness known and available to the prosecution should be called during the case-in-chief (*People* v. *Carter* (1957) 48 Cal.2d 737, 753-754 [312 P.2d 665]), circumstances may make that order of proof impossible. The order of proof lies within the sound discretion of the trial court ([Pen. Code,] § 1094; *People* v. *Mosher* (1969) 1 Cal.3d 379, 399 [82 Cal.Rptr. 379, 461 P.2d 659])." (*People* v. *Lanphear* (1980) 26 Cal.3d 814, 834 [163 Cal.Rptr. 601, 608 P.2d 689].) As in *Lanphear,* "on the particular facts of this case we find no abuse of discretion in permitting the rebuttal evidence either for impeachment or as part of the case-in-chief out of order." (*Id.* at pp. 834-835.)

### 4. *Prosecutorial Misconduct.*

Defendant contends the prosecutor committed misconduct by asking him on cross-examination about (1) the term "enforcer," (2) a threat to kill the

Stevensons, and (3) his reasons for using the name Alfred Filds at the hospital and upon his arrest. No misconduct is apparent in such questions.

█ A defendant "can be cross-examined with respect to facts or denials which are necessarily implied from the testimony in chief, as well as with respect to facts which he expressly states." (*People* v. *Teshara* (1904) 141 Cal. 633, 638 [75 P. 338].) A defendant "cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies." (*Ibid.*)

Here the prosecutor never specifically asked defendant whether he was brought into the forgery ring as an "enforcer." He did, however, ask him whether he was familiar with the term "enforcer," and defendant answered affirmatively. █ Defendant made no objection to this question and hence this claim is waived. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) Defendant also made no objection to the prosecutor's question concerning whether he had ever taken any "muscle-type" actions against the Stevenson family. In the absence of an objection, this claim of error is also waived under *Green*. Defendant did object to the question whether Duck Taylor had brought him into the forgery ring to "lean" on James Stevenson. The question, however, was proper in that it sought to explore defendant's role in the forgery ring and cast doubt on his claim that he was to be paid a big cut of $25,000 for merely sitting at the apartment. Contrary to defendant's assertion, the testimony of Melvin Hines did not "repudiate" the prosecution's "enforcer" theory. When Hines was asked whether defendant was Duck's enforcer, the court sustained the defense objection on the ground that the question called for speculation.

█ The prosecutor's question about whether defendant had threatened to kill the Stevenson family was proper cross-examination. Defendant had implicitly denied having made such threats by his testimony that he went to the Stevenson house for the peaceful purpose of picking up the money they had agreed to pay him. The situation here is unlike that in *People* v. *Wagner* (1975) 13 Cal.3d 612 [119 Cal.Rptr. 457, 532 P.2d 105], upon which defendant relies, for *Wagner* dealt with specific instances of conduct unrelated to the crime charged. The specific instances at issue here were part of the conduct that led to the charged crimes.

Defendant further contends that the prosecutor's questions regarding defendant's reasons for using the name Alfred Filds insinuated there was some other misconduct by defendant which was being kept from the jury. Defendant reads too much into the questions, the import of which was at

best unclear. In any event, such questions did not result in a miscarriage of justice. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.)

Defendant next contends it was improper for the prosecutor to knowingly allow Maurice Stevenson to testify falsely and then later to justify this decision before the jury. The false testimony to which defendant refers is the denial by Maurice of any knowledge of or involvement in a forgery ring.

The record, however, does not support defendant's assertion that the prosecutor knew of Maurice's involvement with the forgery ring at the time Maurice testified. As previously mentioned, the prosecutor had no knowledge of the relationship between the shootings and defendant's involvement in the forgery ring until the cross-examination of Maurice. Before that he had assumed that the shootings were motivated by drugs. He had searched law enforcement records and had found no connection between Maurice, Lonnie and defendant. Nor had he found any evidence that Maurice and Lonnie were involved in the forgery ring. He had been able to link only James and a John Stevenson to the forgery ring. The trial court accepted the prosecutor's explanation, and defendant has failed to persuade us that the court was wrong.

Defendant also objects to the prosecutor's response to defense counsel's argument that he had been "conned" by the Stevensons. The prosecutor disputed that charge, stating: "When you say, so to speak, that the Stevensons conned me, let me tell you, ladies and gentlemen, nobody is going to con me. All right. The moment I find out who the victim is, I do a certain series of things. I do this in any case." Defense counsel objected, and the court instructed the prosecutor to restrict his argument to the evidence. The court's admonition was sufficient on this point.

Defendant also charges the prosecutor with misconduct in injecting his personal beliefs into his final argument. To support this contention, he cites a portion of the argument where the prosecutor referred to Maurice's testimony that he started shaking after defendant said he was going to kill them: "Now that to me would be the kind of reaction I would expect from a person who realizes he's about to die. I tried to put myself in the same position. If I had my hands up against the building, I had just been pat searched by a man that I knew was capable of threatening to kill—[objection overruled]. [¶] What would my response be? How would I feel? What would I do? And I think like Maurice or like anyone else in that position, I'd start shaking. I couldn't control my body or muscles. [¶] He [Maurice] says that Lonnie makes the statement as he's running down the driveway having been shot, 'Daddy, daddy, come out. Fred's here shooting us.' [¶] Now, that is significant to me. Why would Maurice say Lonnie said,

'Daddy, daddy, come out. Fred's out here shooting us? Why would Maurice say it? Because it happened. He heard Lonnie say that."

Contrary to defendant's contentions, this argument was not improper. The prosecutor was properly analyzing why he thought the jury should believe Maurice's testimony. He does not appear to have vouched for Maurice's credibility, as defendant asserts. Nor did he imply that he had personal knowledge concerning defendant's guilt. His argument was based on the evidence presented. It was not like that condemned in *People* v. *Talle* (1952) 111 Cal.App.2d 650, 673-675 [245 P.2d 633], where the prosecutor said, "God knows that Talle is guilty," and implied that he had much more evidence of defendant's guilt that he would show the jury after the trial. Defendant's reliance on *People* v. *Perez* (1962) 58 Cal.2d 229, 245 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], is also misplaced, for here the prosecutor did not make a bald statement as to the witness's credibility; he argued the evidence supporting such a conclusion.

Defendant contends the prosecutor vouched for Sergeant Sitterud, who interviewed defendant after his arrest. The prosecutor stated: "I know Sergeant Sitterud personally. I've had him in many murder cases. And I started thinking that must have been—" Defense counsel objected, and the court said, "Whether you know him or not doesn't make any difference." Sergeant Sitterud was not a witness. His name was mentioned only in connection with defendant's testimony about why he gave Sitterud different stories when he was arrested. The court's comment was sufficient to cure any impropriety in the prosecutor's argument.

Defendant also objects to the prosecutor's argument about defendant's motivation in changing his story three times while talking to Sergeant Sitterud. Defendant denied that he was motivated to talk to Sitterud in order to find out what the police knew about the case. In making the argument that defendant was attempting to find out what Sitterud knew, the prosecutor stated at the outset that he was making his own inference from the evidence. The record supports such an inference.

Defendant refers to three other isolated comments by the prosecutor as indicating expressions of personal belief and conveying the impression that he had other information about defendant which was not introduced at trial. Each comment, however, when viewed in context, was a reasonable argument based on the evidence.

Defendant contends the prosecutor vouched for Melvin Hines's credibility by the following:

"He said: Yeah, I'm part of the forgery ring and have been for nine years. All that under oath. It's transcribed. Where do you think the transcript is going to go? Do you think it's just going to be filed someplace? It's already . been mailed to the F.B.I. It's already been filed.

"MR. CARTER [defense counsel]: I would object to that. That is not part of the evidence.

"MR. BRAVERMAN [defense counsel]: It's not evidence. I haven't mailed it yet.

"MR. CUMMINGS [prosecutor]: I have."

We conclude the foregoing did not amount to the prosecutor's vouching for Hines's credibility.

We similarly find no merit in defendant's claim that the prosecutor's reference to the defense being able to prove the existence of the forgery ring was an attempt to shift the burden of proof to defendant. The reference was in response to defense implications of law enforcement ineptness and could not fairly be read as attempting to shift the burden of proof. Moreover, by the end of the trial, there was no dispute about the existence of the forgery ring.

■ A prosecutor has wide range to state his views of the evidence and the conclusions to be drawn therefrom. In his argument to the jury the prosecutor may comment upon the credibility of witnesses in light of the evidence in the case. He may not, however, express his personal belief as to the reliability of a witness. (*People* v. *Perez, supra,* 58 Cal.2d at p. 245.) Although the prosecutor here may have skirted the edge on a few occasions, he did not overstep the bounds on stating his views. There is no reasonable probability that anything in the record, singly or cumulatively, amounted to misconduct which affected the verdict.

5. *Multiple Use of Same Robbery.*

■ Defendant contends that use of the same robbery as the basis for the felony-murder rule, as a special circumstance, and as an aggravating circumstance in the penalty phase, violates the double jeopardy clause and the Eighth Amendment's proscription against double punishment.[7] He re-

---

[7] For purposes of this discussion we assume that the jury based its finding of first degree murder on the felony-murder theory. Instructions were also given on premeditation and deliberation, and we do not actually know which theory the jury used to convict defendant.

lies primarily on *State* v. *Cherry* (1979) 298 N.C. 86 [257 S.E.2d. 551] and *Collins* v. *Lockhart* (8th Cir. 1985) 754 F.2d 258].

Under the North Carolina statute at issue in *Cherry,* any finding of first degree murder leads to a sentencing proceeding for determination of whether the defendant should be sentenced to death or life imprisonment. Only a first degree felony-murder conviction, however, automatically carried with it an aggravating circumstance. The North Carolina court found that this scheme made a felony-murder defendant's chance of receiving a death sentence disproportionately higher than that of other first degree murder defendants. Accordingly, it held that the felony-murder aggravating circumstance should not be submitted at the sentencing phase when a defendant has been convicted of first degree murder under the felony-murder rule.

In *Collins* v. *Lockhart, supra,* 754 F.2d 258, the Eighth Circuit found a similar flaw in the Arkansas statute. There the defendant was found guilty of robbery-felony murder, one of six types of murder which could subject him to the possibility of the death penalty. However, under the Arkansas statutory scheme felony murder was not *itself* sufficient to justify the death penalty. In addition, the jury had to find the existence of at least one of six statutorily defined aggravating circumstances in order to impose the death penalty. One of the six defined aggravating circumstances was a "capital felony . . . committed for financial gain." The Eighth Circuit decided that the same robbery which made the murder a capital murder, could not also be used to satisfy the aggravating circumstance of "capital felony committed for financial gain." The court said: "[i]n effect, a robber-murderer enters the sentencing phase with a built-in aggravating circumstance." (*Id.* at p. 264.) The court found this violative of the Eighth Amendment because the aggravating circumstance did not serve its intended function of narrowing the class of murderers eligible for the death penalty.

However, our statutory scheme differs from the North Carolina and Arkansas statutes in that the finding of a felony-murder special circumstance makes the death penalty no more mandatory than the finding of any other special circumstance. Under our penalty scheme, the jury must weigh the factors in aggravation and mitigation to determine penalty. The circumstances of the crime is an aggravating factor as to all defendants who reach the penalty phase. Thus defendants with a felony-murder special circumstance are subject to no greater chance of receiving the death penalty than any other defendant against whom a special circumstance finding has been made.

Defendant's double jeopardy argument was answered in *People* v. *Balderas* (1985) 41 Cal.3d 144, 199-200 [222 Cal.Rptr. 184, 711 P.2d 480],

where we rejected an argument that there is any double jeopardy or multiple punishment problem arising from use of the same felony for first degree felony murder and a felony-murder special circumstance.

6. *Speedy Trial.*

Defendant contends there were violations of both his right to a speedy preliminary hearing under section 859b and his statutory and constitutional right to a speedy trial.

Defendant was arrested on December 29, 1979. He was brought to court on December 31, at which time the matter was continued. It was again continued on January 2, 1980. On January 4, 1980, after entry of plea, the following occurred: "Mr. Meyer [Defense Counsel]: There will also be a general time waiver at this time, your Honor.

"Mr. Gates, you have a right to a preliminary examination in this case within, as I recall it, ten judicial days. Do you give up that right so that your case might be set later than ten judicial days?

"Defendant Gates: Ah—yeah. Right now?

"Mr. Meyer: Yes, right now. May that be entered, your Honor?

"The Court: The response was, 'Yes. Right now?' Any time waiver of course is subject to later withdrawal.

"Mr. Meyer: I have told my client that, your Honor. I have not filed with this Court a proposed discovery order. However, I understand that there is a standing order of this Court—"

After a discussion about completion of discovery by January 14, the matter was calendared for January 16 "to set." On January 16, defense counsel informed the court that defendant had been removed to Los Angeles for proceedings related to a murder charge there. He noted that time had been waived. Because it was not known how long defendant would be in Los Angeles, the matter was rescheduled a number of times.

On July 15, 1980, defense counsel informed the court that the Los Angeles proceedings had been interrupted by a petition for extraordinary writ. Accordingly, he asked the prosecutor to bring a removal order for defendant's return. The matter was put over to August 5 "to set."

On August 5, defendant was present and stated he wanted to declare a conflict of interest with his counsel. He asserted that counsel had told him

that the time waiver entered on January 4 was for only 10 days. He also asserted that the court had told him it was for only 10 days. Defendant's counsel disagreed. The court appointed a separate attorney to report on whether there was a conflict.

On August 8, 1980, the court declared there was a possible conflict and, with defendant's personal time waiver, put the matter over to August 11 for appointment of new counsel. On August 11, Robert Braverman was appointed to represent defendant.

Defendant's next appearance was on August 27, 1980, when counsel moved to dismiss the prosecution on the basis of violation of his right to a speedy preliminary hearing under section 859b. The motion was denied, and the preliminary hearing was set for September 8, 1980. The magistrate made a specific finding that there had been a time waiver.

On September 8, 1980, the preliminary hearing was held, and defendant was bound over.

On September 11, defendant was arraigned on the information and entered his pleas. After that appearance defendant was again removed to Los Angeles.

On November 7, 1980, defense counsel moved to dismiss for violation of the 60-day provision of section 1382. Counsel acknowledged that defendant was "presently in trial in Los Angeles County on another death penalty case which apparently will take some time." In response the prosecutor said his office had a removal order on file and that defendant would be brought back upon completion of the Los Angeles trial. He asserted that this was good cause for going beyond the 60-day limit and asked that the matter be on calendar each week until defendant was returned to Alameda County. The trial court found good cause for the continuance.

The matter was on calendar November 14, 21 and December 1. On December 9, 1980, with defendant present, his counsel stated that defendant would enter a limited time waiver with the understanding that he did not wish to forego any claims as to past proceedings. Defendant entered a limited waiver.

On March 9, 1981, defendant's section 995 motion to dismiss on speedy trial grounds was heard. Attorney Carl Meyer, who had initially represented defendant, testified that he had discussed the case with defendant and advised him to waive time to allow for proper investigation. According to Meyer, defendant appreciated what he was told and said he was willing to

waive time. He told defendant that the time waiver could be withdrawn and that they might want to reassess the idea of a general time waiver once they had the information they wanted. Defendant expressed no confusion as to the meaning of a time waiver. He expressed a desire to resolve the Los Angeles charges before trial in Alameda County.

Defendant was removed to Los Angeles after the January 4 appearance. Although Meyer had no direct contact with defendant until August, he spoke to his attorneys on a number of occasions. Between January and August, Meyer said he received no communication from defendant telling him he wished to withdraw his time waiver in Alameda County. He requested defendant's removal from Los Angeles as soon as he was informed by defendant's attorneys that there was a delay in Los Angeles and defendant wanted to return to Alameda County.

Defendant testified and contradicted much of Meyer's testimony. He denied saying he wanted the Los Angeles case to go first. He said he had only agreed to give Meyer a 10-day time waiver. Defendant acknowledged telling his Los Angeles attorney that he wanted to try the Los Angeles case as soon as possible even if that meant trying the Los Angeles case before the Alameda case.

At the conclusion of testimony on the speedy trial issue, the court reviewed all relevant municipal court transcripts and certain transcripts of the Los Angeles proceedings. The court found that there had been a general time waiver entered on January 4, 1980.

■■■ Defendant's claim of violation of his speedy preliminary hearing right under section 859b is answered by the trial court's finding of a general waiver. That finding is supported by substantial evidence and therefore must stand.

Defendant's statutory and constitutional speedy trial claims are also without merit. It is apparent that there was good cause for any delays to which defendant had not consented. Obviously, defendant could not have been in two places at once. ■■■ The pendency of another trial necessarily constitutes good cause. (*Crockett* v. *Superior Court* (1975) 14 Cal.3d 433, 441, fn. 10 [121 Cal.Rptr. 457, 535 P.2d 321]; *People* v. *Bradford* (1976) 17 Cal.3d 8, 19 [130 Cal.Rptr. 129, 549 P.2d 1225].)

### C. SPECIAL CIRCUMSTANCES ISSUES

#### 1. *Carlos Error.*

Defendant contends that the court erred under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], in failing to instruct

the jury that it could not find the robbery-murder special circumstance true unless it found that defendant intended to kill at the time of the homicide. His contention must be rejected.

In *People* v. *Anderson, ante,* page 1104, at page 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], we held that with respect to the actual killer, the court need not instruct on intent to kill in connection with felony-murder special circumstances. Such an instruction is required only when there is evidence from which the jury could find that the defendant was an accomplice rather than the actual killer. Since defendant was the actual killer, he was not entitled to an instruction on intent to kill.

2. *Green Instruction.*

The court gave the 1980 revision of CALJIC No. 8.81.17, which incorporates the holding of *People* v. *Green, supra,* 27 Cal.3d 1, 59-62, which requires the jury to find, in a robbery-murder special circumstance, the killing was committed in order to carry out or advance the commission of the robbery or to facilitate the escape therefrom or to avoid detection thereof. Defendant contends that the court erroneously gave the instruction by substituting the word "or" for "and" as italicized in the following passage: "Now, to find that the special circumstance, which is murder in the commission of a robbery, is true, it must be proved beyond a reasonable doubt: (1) That the murder was committed while the defendant was engaged in the commission or attempted commission of a robbery, or that the murder was committed during the immediate flight after the commission of a robbery, *or* that the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. . . ."

If the judge misspoke, as the reporter's transcript appears to indicate, his mistake was cured by the further instruction and illustrations he gave on this issue. We believe the jury could not reasonably have been misled when all instructions and illustrations on this subject are considered.

## II. PENALTY PHASE

### A. FACTS

1. *Prosecution Case.*

The prosecution presented in aggravation evidence of other crimes committed by defendant: the robbery-beating of two women and murder of one of them at the Conner-Johnson Mortuary on November 6, 1978; the November 27, 1978, robbery of the manager of a McDonald's and the shooting

of two trash collectors during his escape from the McDonald's robbery scene; and the rape and kidnapping of two women in 1973. Defendant had been convicted of all of these crimes except for the mortuary crimes.

a) *Mortuary Crimes.*

Ann Townsend testified that she was working as a secretary, together with her sister, Helen Wright, at the Conner-Johnson Mortuary in Los Angeles on November 6, 1978. Two Black men came to the door asking to see some caskets a few minutes after David Garcia, the janitor, had left. As she showed them caskets, the stockier of the two men pulled a gun. He hit her on the head with it and told her to take him to the money. She took him to her purse where he took two $20 bills. While this was happening, her sister Helen came downstairs; the stocky man grabbed Helen, hit her on the head with the gun and took both women upstairs to the safe. Helen opened the safe. The stocky man told the other man to take Ms. Townsend downstairs and kill her because he was going to kill her sister. The man took Ms. Townsend downstairs and beat her until she lost consciousness. As she came to, she heard the stocky man ask the other if she was dead. The man said yes. The stocky man then said that he had killed her sister. Ms. Townsend was unable to identify either of the two men.

Los Angeles Police Detective Fesperman testified that he found the body of Helen Wright on the floor with her hands and feet bound. A blue cloth bag was under her head. Fingerprints at the scene were matched to those of Calvin Miller, who was eventually arrested and gave a statement implicating defendant.

Calvin Miller testified that he had pleaded guilty to second degree murder in connection with the mortuary killing as part of a plea bargain in which he promised to testify against defendant. He met defendant at San Quentin and ran into him in 1978 in Los Angeles after they had both been paroled there. He and defendant were friendly. On November 6, 1978, defendant asked Miller to ride with him to David Garcia's house. When they got there, defendant picked up a .357 magnum in a blue cloth bag from Garcia. They then drove with Garcia to the Conner-Johnson Mortuary where defendant asked Garcia to go in and see how many people were there. Garcia did so and reported that there was only one person. Garcia then left, and Miller and defendant went inside. Once inside they asked a woman to show them some caskets. As she was doing so, defendant pulled a gun and hit her on the head with it, demanding money. They took the woman to the office and went through her desk and purse.

Another woman came downstairs. They all then went upstairs. Defendant began beating on the newly discovered woman and demanding money.

Defendant told Miller to take the first woman downstairs and kill her. Defendant said he was going to kill the one upstairs. When defendant came downstairs, Miller told defendant he had killed the woman. They left and drove by David Garcia's house. Defendant told Garcia that he had had to kill the woman because she started screaming.

The testimony of David Garcia, who had died before the trial, was read from the transcript of defendant's preliminary hearing on these charges. He testified defendant and Miller had come to Garcia's house on November 6, 1978, to pick up the gun he had been keeping for defendant. It was a loaded .357 magnum. Garcia had kept the gun and bullets in a blue cloth bag that Garcia's girlfriend had made for him. He gave it to defendant in the blue cloth bag. Garcia rode with defendant and Miller to the Conner-Johnson Mortuary where Garcia worked as a janitor. Defendant asked Garcia to go in and see how many people were there. Garcia did so and told him one person. Garcia then left.

Defendant and Miller drove to Garcia's house about 45 minutes later. They were covered with blood. Miller said to defendant, "Man, you didn't have to kill her." Defendant answered, "She screamed." Garcia identified the blue cloth bag found under Helen Wright's body as the one he had put the gun in when he gave it to defendant.

Evelyn Bostic, Calvin Miller's live-in girlfriend, testified about receiving a series of phone calls from defendant. He told her he had committed the murder at the mortuary and asked her what was happening with Miller. Ms. Bostic contacted the police after having received two phone calls from defendant. The police put a recording device on her phone and recorded two phone conversations between Ms. Bostic and defendant. The recordings were played for the jury.

b) *McDonald's Crimes.*

Thomas Mammen, who was the manager of a McDonald's restaurant in Culver City, testified that around 6:30 a.m. on November 27, 1978, defendant forced his way in, robbed him, and hit him on the head with his gun. As defendant ran out, Mammen followed and saw a garbage truck driven by Willie Duncan and Alex Jimenez. Mammen yelled that he had been robbed. About this time the police arrived in response to the silent alarm.

Willie Duncan was collecting trash when Mammen yelled that he had been robbed and pointed to a man wearing a green top with an orange hat running from the parking lot. As Duncan and Jimenez got in the truck, they discussed the fact that McDonald's had just been robbed. Jimenez said

the man was sitting right there in the car. The man then came up to Duncan, held a gun at his chest and fired. Duncan said his assailant was the same man he had seen running from McDonald's. After Duncan fell to the ground, the man opened the door of the truck and shot into it.

Alex Jimenez testified that he was collecting trash with Willie Duncan when he was shot. He blacked out and was in a coma for three months. He does not remember the details of what happened.

Police Officer Irving testified that he responded to the silent alarm at McDonald's. The manager gave him a description of the robber and the direction of his flight. As he searched the neighborhood, he saw a trash truck and two men standing by it. The man wearing a green sweater or sweatshirt shot the other man. He heard another shot and then saw the man run.

The man got in his car, and Irving chased it on foot. The car hit the curb, jumped the center divider and crashed into a parked car. The man got out and ran off. A search of the car revealed the proceeds of the robbery, an orange hat, papers with defendant's name on them, and a gun.

Counsel stipulated that defendant had been convicted of the robbery of Mammen and assaults on Duncan and Jimenez.

c) *Rape of Dolores J.*

Mrs. J. testified that while she was sitting in her car on February 27, 1973, defendant forced his way in and ordered her to drive to a different location where he raped her.

Counsel stipulated that defendant had been convicted of the rape of Mrs. J.

d) *Kidnap.*

No testimony was presented by the victim of the 1973 kidnap conviction. The parties stipulated that defendant had been convicted of kidnap on May 2, 1974.

2. *Defense Case.*

Defendant's mother, brother and sister testified about defendant's upbringing in Belzoni, Mississippi. He was the youngest of six children. Defendant, who was 29 years old at the time of trial, had attended segregated

schools and had a perfect attendance record until he dropped out in high school. He played baseball, went to church and participated in civil rights activities with the rest of the family. Defendant's sister Carrie Gates, a music teacher with a master's degree, described Belzoni as "a very prejudiced place to live at the time." Defendant's brother, who also had a master's degree, confirmed his sister's description of Belzoni.

Defendant never had any trouble until an incident at the Western Auto Store when he was between 14 and 16.[8] He spent six months in jail as a result of the incident. After that the police would look for defendant any time there was a problem.

On one occasion defendant was picked up for the shooting of a bus station attendant. Defendant's family was continually misled as to where he was being held, and they spent considerable time trying to locate him. Eventually, they had to call the Justice Department to find him. The charges were dismissed after the victim said his assailant was not Black. Defendant then moved to California.

Defendant's mother visited him once in California in 1973. He was in the jail hospital and had been beaten by the police. She next saw him in 1978 when he came to Belzoni for a visit.

Three people who had been neighbors of defendant in the Fairmount apartment building in Oakland testified. Desiree Pugh described defendant as a very dear friend who was always sweet and considerate toward her and her family. He checked in on her regularly when she was pregnant and was very concerned about her welfare. Defendant continued to check in by phone after he was in jail.

Frances Marion, who lived with Joe Lombard at the Fairmount building, described defendant as a good-hearted, good-natured person who never got angry or raised his voice.

Joe Lombard testified that defendant got along extremely well with people. He had a friendly, outgoing personality.

Dr. Paul Berg, a clinical psychologist, testified that on the basis of his interview with defendant and his review of defendant's prison records, he thought defendant was an unusually well-adjusted prisoner. In his opinion, there was a great likelihood that defendant would again adjust well to prison and present no problem.

---

[8] According to defendant's brother, the owner of the Western Auto Store was a white racist who belonged to a group similar to the Ku Klux Klan.

## B. Procedure

At the conclusion of the penalty phase evidence, the court gave only three instructions: CALJIC Nos. 8.84, 8.84.1, and a modified version of 8.84.2 using the word "may" instead of the word "shall."[9] The court gave no instruction on sympathy.

During deliberations, the jury requested the evidence from the second part of the trial, particularly the tape of defendant's phone conversation with Evelyn Bostic.

Sometime later the jury requested the court to explain the use of the word "may" in its modified CALJIC No. 8.84.2. The court gave a lengthy explanation, which we discuss later.

The next day the jury requested further instructions "as to how much of the second part of the trial should be considered in arriving at our decision." The court explained that the first phase of the trial had concerned guilt or innocence and the special circumstance finding. In the second phase the jury was to determine the penalty —life without possibility of parole or death—by considering the factors previously listed. The court's review of the factors will also be discussed later.

The jury reached its verdict the next day, imposing a sentence of death.

## C. Contentions

### 1. *Denial of Motion to Re-Voir Dire the Jury.*

After the guilt phase verdicts had been returned, defense counsel moved for a new jury, and when that motion was denied, he moved to re-voir dire the jury. Both motions were based on general allegations of prejudice and general publicity regarding crimes and criticism of the judicial system.

Section 190.4, subdivision (c) states: "If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty

---

[9] The court gave CALJIC No. 8.84.2 as follows: "It is now, ladies and gentlemen, your duty to determine which of the two penalties, death or confinement in the State Prison for life without possibility of parole, shall be imposed. [¶] After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravation and mitigation upon which I have just instructed you. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you may impose a sentence of confinement in the State Prison for life without the possibility of parole. . . ."

was a jury, the same jury shall consider . . . the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record and cause them to be entered into the minutes."

Section 190.4, subdivision (c) expresses the longstanding legislative preference for a single jury to determine both guilt and penalty. (*People* v. *Gonzales* (1967) 66 Cal.2d 482, 499 [58 Cal.Rptr. 361, 426 P.2d 929].) As we noted in *People* v. *Fields* (1983) 35 Cal.3d 329, 351-352 [197 Cal.Rptr. 803, 673 P.2d 680], the statutory preference for a single jury in capital cases is supported by a number of weighty considerations.

It seems clear that the court did not err in denying the defense request to re-voir dire the jury. No cause for genuine concern was raised by the publicity about other crimes and criticism of the criminal justice system. There is no direct authority on the meaning of "good cause" in this context. There are, however, cases involving the question of good cause for discharge of a juror under sections 1123 and 1089. As to the latter statutes, the facts must "show an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality." (*People* v. *Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537].) Defendant's showing was entirely speculative, raising no duty on the part of the court to question the jurors.[10]

### 2. *Instructions and Argument on Mitigation.*

Defense efforts at the penalty phase were devoted to showing redeeming features of defendant's character and background that would warrant the jury's mercy. As noted, the defense presented seven witnesses who testified about defendant's character and background. Extensive portions of defense argument were directed to this evidence and a lesser portion of prosecution argument. The argument of one of defendant's attorneys was almost entire-

---

[10] Defendant's further claim that the court was confused about the applicable law is not supported by the record. The court asked counsel if in seeking re-voir dire, he wanted the court to reopen *Hovey.* (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].) Counsel replied that that would probably be the effect of the grant of his motion. The court's response on the *Hovey,* discussion indicates its understanding of the applicable law: "You're upset that the newspapers are talking now with the violence of the assassination on the Pope and the President, that the statements by various legislators, our Governor, various judges, that the death penalty should be imposed more quickly, that we should have a more revengeful society, has jaundiced that jury so they may be more quick to choose death instead of life. MR. BRAVERMAN: Yes. THE COURT: I think that's not a *Hovey.* My only answer to you is I have constantly admonished them to reach no decision, not to discuss the case."

ly a plea for mercy which was not directly related to the facts of the crime. Defense counsel did not attempt to contest the evidence of other crimes presented by the prosecution.

The trial court gave CALJIC No. 8.84.1 as it read before its amendment in response to a suggestion in *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813], for clarification of the subdivision (k) factor of section 190.3. ▮▮▮ Defendant contends that the giving of this instruction with the unadorned factor (k) language, coupled with comments made in the prosecution argument, misled the jurors into believing that they were not allowed to consider the mitigating evidence presented by the defense.[11] We do not agree.

CALJIC No. 8.84.1 has since been amended to add the following phrase to factor (k): "and any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." We do not believe that simply because this phrase was not included, the jury was left with the impression it could not consider the defense evidence presented concerning defendant's background and character. Indeed, the jury was specifically instructed to "consider *all* of the evidence which has been received during any part of the trial in this case." It would defy all logic and reason to conclude that the jury which heard seven witnesses testify concerning the defendant's background and character, was directed to consider "all of the evidence," and heard defense counsel argue this evidence at length, would somehow have concluded that it could not consider this testimony in its penalty determination. Jurors are not without common sense; the jury necessarily must have considered this defense evidence in its penalty decision.

▮▮▮ Defendant further contends that the instructional defect was exacerbated by the prosecutor's penalty phase argument: "It's not a time to talk for mercy or forgiveness for Oscar Gates. It's too late for that. All throughout voir dire we talked about would you follow the law, would you base

---

[11] The court gave CALJIC No. 8.84.1 as follows: "*In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received* during any part of the trial in this case. You shall consider, take into account, and be guided by the following factors, if applicable: (1) The circumstance of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true; (2) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence; (3) The presence or absence of any felony conviction; (4) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct; (5) The age of the defendant at the time of the crime; and (6) *Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime*" (factor (k)).

your decision on evidence received in the court, not religion, not mercy, forgiveness, philosophy, anything you personally might believe or feel, not feelings of guilt on your part or sorrow for his family. [¶] The evidence that you received in the case, that's what you promised the judge you'd base your decision on, because the time now is not for philosophy or religion, mercy, forgiveness, sorry [sic] for the family, feelings of guilt on your own part. The time now is, I would say, a time for justice for Oscar Gates. Now is the time for an accounting finally."

Although defendant raised no objection at trial, he now contends that the prosecutor was telling the jurors they could not consider any sympathy toward defendant based on the evidence of his upbringing and background. We believe that is not a fair assessment of the argument. The prosecutor was stating that in his view of the evidence, defendant was not worthy of mercy. He did not say that the jury could not consider any mercy or sympathy factors which were supported by the evidence. This is not like the argument in *People* v. *Robertson* (1982) 33 Cal.3d 21, 58 [188 Cal.Rptr. 77, 655 P.2d 279], where the prosecutor told the jury not to consider the defendant's family background and other sympathy factors on which evidence had been presented. In this case the prosecutor never argued that the jury could not consider any of the defense evidence presented. The prosecutor did, in fact, review the evidence presented by the defense regarding defendant's background and family and argue his interpretation of it.

### 3. *Burden of Proof.*

██ Defendant contends the due process and cruel and/or unusual punishment clauses of the federal and state Constitutions require that a capital jury be instructed that it must find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances and that death is the appropriate penalty.

We recently rejected such a claim in *People* v. *Rodriguez* (1986) 42 Cal.3d 730 [230 Cal.Rptr. 667, 726 P.2d 113].

### 4. *Evidence of Other Crimes.*

Defendant makes a number of claims of error with regard to the admission of evidence of other crimes committed by him. As noted, the prosecution introduced evidence relating to the robbery, beatings and murder at the Conner-Johnson Mortuary in Los Angeles on November 6, 1978. At the time of trial defendant had not been convicted of those crimes. The other crimes all involved convictions —1973 convictions for kidnapping of one victim and the rape of another, and 1980 convictions of robbery of the

McDonald's manager and assault with a deadly weapon on the two trash collectors.

 Defendant correctly asserts that the court erred in failing to instruct sua sponte that the jury could not consider the other-crimes evidence unless the commission of such crimes had been proven beyond a reasonable doubt.[12] (*People* v. *Davenport, supra,* 41 Cal.3d 247, 280; *People* v. *Robertson, supra,* 33 Cal.3d at pp. 53-55.) The error, however, is harmless. It principally affects the mortuary crimes, since defendant had been convicted of the other crimes.[13] The evidence of defendant's guilt as to these crimes was overwhelming. The testimony of David Garcia and Calvin Miller regarding defendant's involvement was remarkably consistent, even as to small details. The blue cloth bag found under the murder victim's body was the one Garcia had given defendant. Evelyn Bostic testified about defendant's admissions of guilt, and her testimony was substantiated to a great extent by the tape recordings.

More importantly, defendant did not challenge or object to any of the evidence of other crimes presented by the prosecution. Nor did he cross-examine any of the prosecution witnesses. Defendant now points to alleged weaknesses in the mortuary crimes evidence—e.g., bias of Miller and Bostick, inability of Ann Townsend to identify her assailants—which he claims illustrate the impossibility of concluding that his guilt was established as a matter of law. He also notes that his trial on these charges ended with a hung jury.[14] Defendant's argument is unconvincing. The evidence presented in this case leaves no doubt that defendant committed the mortuary crimes. Whatever caused the Los Angeles jury to deadlock may have been impeaching evidence that was not presented here. On the record before us, it is inconceivable that the jury would have reached a different result had it been instructed that it could not consider the mortuary crimes unless it was convinced beyond a reasonable doubt that defendant committed them.

 Defendant also claims that section 190.3, subdivision (b) is unconstitutional insofar as it allows the jury which has already determined a defendant's guilt to consider other violent crimes on which he was neither charged nor convicted. We rejected a similar claim in *People* v. *Balderas, supra,* 41 Cal.3d at pages 204-205.

---

[12] Defendant is not correct, however, in asserting that the court was also required to instruct sua sponte on the elements of the crimes; the court need only so instruct upon request. (*People* v. *Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 281-282 [221 Cal.Rptr. 794, 710 P.2d 861].)

[13] It also affects the testimony of Dolores J. to the extent it showed defendant committed kidnapping as well as the rape for which he was convicted.

[14] Defendant was ultimately convicted of these charges on retrial.

■ Defendant claims that in addition to being instructed that they could not consider the mortuary crimes unless they were convinced beyond a reasonable doubt that defendant committed them, the jury should also have been required to make written findings to that effect. We rejected such a claim as to the 1977 law in *People* v. *Frierson* (1979) 25 Cal.3d 142, 178-180 [158 Cal.Rptr. 281, 599 P.2d 587] and *People* v. *Jackson* (1980) 28 Cal.3d 264, 316-317 [168 Cal.Rptr. 603, 618 P.2d 149]. Our reasoning relating to the 1977 law applies equally to the 1978 law.

■ Defendant contends that the prosecution should not have been allowed to present testimony regarding one of the 1972 assaults and the McDonald's incident, since his counsel had stipulated to these convictions. We disagree. When dealing with violent conduct it is not the *fact* of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense. Defendant's contention might have had merit had the convictions involved *nonviolent* conduct, since the admission of such evidence is strictly limited by subdivision (c) of section 190.3. But the convictions here involved *violent* conduct and were thus admissible pursuant to subdivision (b) of section 190.3, which permits the introduction of all evidence of violent crimes and does not require a conviction.[15] (See *People* v. *Balderas, supra,* 41 Cal.3d at pp. 202-203.)

5. *Instruction on Weighing Aggravating and Mitigating Circumstances.*

In *People* v. *Brown* (1985) 40 Cal.3d 512, 538-545 [230 Cal.Rptr. 834, 726 P.2d 516] (revd. on other grounds *California* v. *Brown* (1987) 479 U.S. __ [93 L.Ed.2d 934, 107 S.Ct. 837]), we concluded that the directive of section 190.3 that the trier of fact "shall impose a sentence of death" if it "concluded that the aggravating circumstances outweigh the mitigating circumstances," did not impermissibly restrict the jury's constitutional sentencing discretion. We rejected the defendant's proffered mechanistic construction of the words "outweigh" and "shall" in favor of one which directed the jury to weigh the various factors and determine under the relevant evidence which penalty is appropriate in a particular case. We noted, however, that the statutory language—particularly the words "shall impose"— left room for some confusion about the jury's role and therefore directed courts in the future to instruct on the scope of the jury's discretion. We further stated that each prior case "must be examined on its own merits to determine whether, in context, the sentencer·may have been misled to

---

[15]Subdivision (b) provides: "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*Id.* at p. 544, fn. 17.)

Our concerns in *Brown* were essentially two: The first was that the jury might be confused about the nature of the weighing process, that it is not a mere mechanical counting of factors on each side of an imaginary scale but rather a mental balancing process. Our second concern was that use of the word "shall" might mislead the jury as to the substance of the ultimate determination it was called upon to make. In *Brown,* we concluded that the statutory language "should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances. Thus the jury, by weighing the various factors, simply determines under the relevant evidence which penalty is appropriate in the particular case." (40 Cal.3d at p. 541.)

In the present case, the court sought to avoid any confusion about the scope of the jury's sentencing discretion by substituting the word "may" for the word "shall" in the instruction. ▆▆▆ Defendant contends that confusion was nevertheless created by the court's reinstruction in response to a question from the jury and the language of the verdict forms.[16] We do not agree. A review of the court's comments dispels such a conclusion.

In response to the jury's request for explanation of the word "may" in the instructions, the court stated:

". . . I instructed that: If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of death.

"I did that because it is the duty of the Judge to instruct the jury as to the law. The statute says that:

" 'If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a verdict of death.'

"In other words, the statute, itself, says it in a mandatory way. It does say 'shall.'

"The jury may properly say: Well, Judge, why did you say 'may'? And the reason I said 'may,' in effect, the word 'shall' means you should impose

---

[16] The verdict form stated: "We, the jury, in the above-entitled cause, find that the aggravating circumstances outweigh the mitigating circumstances and determine the punishment to be death."

death but you don't have to. Because you see, you are the final, ultimate triers of the facts. You're very much like I am everyday when I sentence people. I decide whether they go to prison, how long.

"You decide what the penalty is. If, even though the statute says, that:

" 'If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death,' you will, as a juror and as an ultimate judge of which penalty, you still can do what you want. And for that reason I use the word 'may,' so I don't take away from you the ultimate discretion of making the ultimate decision.

"Now, I feel somewhat apologetic. I didn't mean—I understand what I'm doing to you. I understand it's a terrible decision, and I hope you don't think I deliberately tried to mislead you. What I tried to do is give you that ultimate discretion that you have in order to arrive at what you feel is a fair verdict.

"I did substitute the word 'may.' Again, I'll tell you what the statute says:

" 'If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a verdict of death.'

"But even if it says that, you can do what you want and nobody can say anything about it. You might say: Hey, Judge, what kind of thing is this to do? That's the way the law is."

The jury later sent out another note asking the court how much of the second part of the trial they should consider. A portion of the court's response to that question contained further explanation of the weighing process:

"And six is the general catchall, which is why, in effect, I substituted the word 'may' instead of 'shall.' Any other circumstance which extenuates the gravity of the crime even though it may not be and is not, in fact, a legal excuse for the crime.

"Now, you then have all these factors in aggravation and mitigation. And then you weigh them; and then you say that, if you conclude that the factors in aggravation outweigh those in mitigation, then you select this punishment. If you find the factors in mitigation outweigh those in aggravation, you select the other punishment.

"Now, I don't know if I can answer anymore precisely that. I can't say: You give a certain percentage to the first phase, ten percent to the

aggravation, five to the mitigation, what have you. I've got to give you it in this general way I did."

A juror then asked, "Regardless of which way it goes, whether it's—If we find, say, predominantly in one direction, do we still have the option to vote the opposite way?" The court responded: "Well, let me only answer it this way: The decision must be unanimous. Each person must render the judgment according to his own finding. [¶] However, the way you determine which punishment is proper is to look at the evidence. From the evidence you must find: Do the factors in aggravation outweigh those in mitigation? If the factors in aggravation outweigh those in mitigation, you vote one way. If the factors in mitigation outweigh the factors in aggravation, you vote another way." The court then reviewed the factors again and ended by stating: "I can't answer any more precisely than that. You do it from the evidence, of course. You make your decision. You don't make a decision [demonstrating]. You make it from the evidence. You take the evidence, and then you weigh it. And in weighing the evidence, you decide a verdict. You don't do it from something outside the courtroom."

We find that the court's comments, taken as a whole, adequately conveyed to the jury the message that it had the ultimate discretion to determine the appropriate penalty and was not bound by any mechanistic counting process.

6. *Comment on the Evidence.*

■ Defendant contends that the court's re-instruction on the aggravating and mitigating factors, with examples from the evidence, amounted to improper comment on the evidence because all of the examples referred to aggravating evidence, thus implying that there was no mitigating evidence. The re-instruction was in response to the jury's question about how much of the second part of the trial should be considered in arriving at its decision. The court noted that in the second phase of the trial the jury must determine which of the two punishments it feels is proper based upon the evidence. It then listed the aggravating and mitigating factors again:

"Now, one of the factors—What are the factors in aggravation? I listed roughly six of them for you. Let me take them again.

"Now, one of them, one factor is: The circumstances of the crime of which the defendant was convicted—that's the first phase—and the existence of any special circumstance found to be true.

"So, you can take into consideration as one factor in aggravation, in effect, the killing and robbery of Lonnie Stevenson.

"Second, you can take into consideration: The presence or absence of criminal activity by the defendant which involve the use of force or the attempted use of force or violence or the express or implied threat to use force or violence.

"Now, that can be the evidence which was introduced—the mortuary murder, the assaultive behavior upon the two garbage men.

"Another factor you can consider in aggravation or mitigation, depending on what you find: The presence or absence of any prior felony conviction.

"You have had evidence introduced to you as to a prior rape conviction and another prior robbery conviction—or kidnap. You had that evidence submitted to you.

"Another factor you consider: Whether or not the offense—that's going back now to the first phase—was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation of his conduct.

"You may take into consideration the age of the defendant, for or against, in aggravation or mitigation.[17]

"And six is the general catchall, which is why, in affect, I substituted the word "may" instead of "shall." Any other circumstance which extenuates the gravity of the crime even though it may not be and is not, in fact, a legal excuse for the crime."

Article VI, section 10 of the California Constitution authorizes the court to "make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." This provision allows the court to do more than merely summarize the evidence. (*People* v. *Cook* (1983) 33 Cal.3d 400, 407 [189 Cal.Rptr. 159, 658 P.2d 86].) The court's comments, however, must be scrupulously fair and may not invade the province of the jury as the exclusive trier of fact. (*Id.* at p. 408.) "[A] judge may restrict his comments to portions of the evidence or to the credibility of a single witness and need not sum up all the testimony, both favorable and unfavorable." (*People* v. *Friend* (1958) 50

---

[17] The court's reference to the possibility of age being an aggravating factor is error under *People* v. *Rodriguez, supra,* 42 Cal.3d at pages 788-789. Since defendant's age was not a factor one way or the other in this case, and no argument was made regarding it, we find the error an insubstantial one which could not possibly have affected the verdict.

Cal.2d 570, 578 [327 P.2d 97]; overruled on other grounds in *People* v. *Cook, supra,* 33 Cal.3d at p. 413, fn. 13.)

No improper comment was made here. The court did not suggest a particular verdict or an opinion on the ultimate issue. Although all of the factual examples cited were aggravating factors, they were not matters of dispute. The mitigating factors, by contrast, were more amorphous and subject to interpretation. Defendant reads far too much into the court's re-instruction in asserting that the failure to give any examples of mitigating evidence necessarily implied that there were none.

7. *Instruction That Circumstances of the Crime Is an Aggravating Factor.*

■ Defendant contends that the court's CALJIC No. 8.84.1 instruction that the jury may consider the circumstances of the crime left the jury with too much discretion. We rejected such a contention in *People* v. *Phillips, supra,* 41 Cal.3d at pages 63-64.

8. *Duty to Instruct Regarding Defendant's Failure to Testify at Penalty Phase.*

■ Defendant, who testified at the guilt phase but not at the penalty phase, contends that the trial court had a duty to instruct sua sponte not to draw any adverse inferences from defendant's failure to testify at the penalty phase. The short answer to this contention is that since the trial court does not even have a sua sponte duty to give such an instruction at the guilt phase (*People* v. *Preston* (1973) 9 Cal.3d 308, 316 [107 Cal.Rptr. 300, 508 P.2d 300]; *People* v. *Gardner* (1969) 71 Cal.2d 843, 852 [79 Cal.Rptr. 743, 457 P.2d 575]), a fortiori the court has no sua sponte duty at the penalty phase.

Although the United States Supreme Court has discussed the giving of a cautionary instruction over a defendant's objection (*Lakeside* v. *Oregon* (1978) 435 U.S. 333 [55 L.Ed.2d 319, 98 S.Ct. 1091]) and on request (*Carter* v. *Kentucky* (1981) 450 U.S. 288 [67 L.Ed.2d 241, 101 S.Ct. 1112]), it has never held that a cautionary instruction is required sua sponte. Accordingly, nothing persuades us to alter our rule set forth in *Gardner* that the court has no sua sponte duty to instruct against adverse inferences from a defendant's failure to testify.

Moreover, the instruction could cause great confusion if it were given at the penalty phase when, as here, the defendant testified at the guilt phase.

At the penalty phase the jury was instructed to consider all the evidence received at the guilt phase, necessarily including defendant's testimony.

9. *Failure to Specify Which Guilt Phase Instructions Were Applicable to Penalty Phase.*

██ The instructions given at the end of the guilt phase of defendant's trial included the appropriate standards for judging the credibility of witnesses (CALJIC Nos. 2.20, 2.21, 2.22) and the standard introductory instruction with its no-sympathy admonition (CALJIC No. 1.00). Defendant contends that the court prejudicially erred at the penalty phase by failing to instruct that the credibility instructions continued to apply and that the no-sympathy instruction did not. The result, according to defendant, was either that the jury thought none of the guilt phase instructions applied and had no standards to guide them on assessing witness credibility, or that they thought all of the guilt phase instructions applied, including the no-sympathy admonition.

We are not convinced that either scenario necessarily occurred. The language of the no-sympathy instruction specifically referred to deciding a defendant's guilt or innocence and would not be necessarily understood as applying to the penalty phase. The witness credibility instructions, by contrast, were not specifically limited to the issue of guilt or innocence.

Nor do we find that there was a prejudicial carryover effect from the guilt phase no-sympathy instruction. As previously mentioned, all of the defense evidence at the penalty phase went to showing redeeming features of defendant's character and background. Most of the defense argument was directed to this evidence. The prosecutor also referred to it and urged his interpretation of it.

10. *Exclusion of Mitigating Evidence.*

██ Defendant contends that testimony by his brother, Abraham Gates, concerning the details of the Western Auto incident in Belzoni, Mississippi was improperly excluded. He concedes that the evidence was hearsay but argues that it nevertheless qualified for admission under the reasoning of *Green v. Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150]. The testimony in question was the following:

"Do you know what it was that Oscar did to the woman at the Western Auto? "A: Well, I wasn't there, but I can only say what I was told.

"MR. CUMMINGS: I'll object to that as hearsay.

"THE COURT: All right. Sustained.

"MR. CARTER: Q. What was the significance of the act that Oscar did?

"A: Well, the significance of the act was that Oscar had—was considered to be—well, considered by whites to be in grave violation, simply because at that time everything was segregated. Oscar had hit a white lady who had hit him first.

"MR. CUMMINGS: Well, I'm going to object to this. If he says he wasn't there, how is he going to testify to all this hearsay?"

In *Green* v. *Georgia, supra,* 442 U.S. 95, the defendant wanted to show at the penalty phase that he was not an active participant in the murder for which he and a second defendant had been convicted. He offered the testimony of a witness who had heard the second defendant say he had killed the victim while the defendant was off running an errand. The trial court rejected the offer under a Georgia rule which, unlike California law, did not recognize an exception to the hearsay rule for declarations against penal interest. The United States Supreme Court held that a mechanistic application of the hearsay rule was inappropriate under those circumstances because (1) the excluded testimony was highly relevant to a critical issue in the punishment phase of the trial; (2) the testimony concerned an admission made spontaneously and against interest; (3) the evidence corroborating the admission was ample; and (4) the state had considered the testimony sufficiently reliable to use it at the trial of the second defendant. (442 U.S. at pp. 96-97 [60 L.Ed.2d at pp. 740-741].)

The testimony in question here is far less relevant than that in *Green*. It was not crucial to the main defense point that defendant had been subjected to police harassment after the Western Auto incident. The brother was permitted to testify as to other incidents of alleged police harassment which occurred subsequent to the incident about which he only had hearsay knowledge. There was ample testimony that racial prejudice existed when defendant was growing up and that he was subject to police harassment after the Western Auto incident.

Defendant also contends that it was error under *Green* to exclude evidence at the penalty phase of the criminal records of Jimmy Stevenson and James Stevenson. The trial court noted that the Stevensons had not been witnesses at the penalty phase and found no basis for admission of such evidence. There was no question about the Stevensons' involvement in forgery and other criminal activity. The evidence clearly did not rise to the level of importance to qualify for admission under *Green*.

Defendant was also denied the opportunity to introduce Calvin Miller's conviction for second degree murder for which he was in prison when he met defendant at San Quentin. Again, this evidence is not so highly relevant that it met the standards of *Green*. The jury knew Miller had been in prison. Defendant chose not to cross-examine Miller for tactical reasons. Thus there was no basis for admission of Miller's prior murder conviction.

11. *Prosecutorial Misconduct*.

Defendant contends the prosecutor committed misconduct in his cross-examination of Dr. Berg and argument about that testimony. On direct examination Dr. Berg testified that defendant's prior records indicate that "his behavior as a prisoner, his record would be considered by most experts as unusually good in prison. In other words, he seems to adjust well. He has almost, almost no difficulty; much less than the majority of inmates that I know, and would be considered a pretty well functioning prisoner." Although Dr. Berg did not expressly predict good future prison behavior, that was the clear implication of his testimony.

Over objection, the prosecutor was allowed to explore the implication made on direct examination that if granted life without possibility of parole, defendant would be a well-behaved prisoner. Although the court sustained an objection to a question which did not specify whether in-prison or out-of-prison behavior was the subject, the court allowed exploration of the basis of Dr. Berg's implication that defendant would again behave well in prison.

There was no impropriety in this line of questioning. Defendant's reliance on *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 767-775 [175 Cal.Rptr. 738, 631 P.2d 446], is misplaced, for there the prosecution tendered the issue of future violence by the defendant in prison. Here, by contrast, it was the defense which raised the subject. If the defense chooses to raise the subject it cannot expect immunity from cross-examination on it.

Defendant also contends that the prosecutor improperly injected his personal beliefs in discussing defendant's background. Defendant objects to the prosecutor's statement in argument that he had "a feeling" that it was not racial harassment which caused defendant to turn out as he did. The context of the statement reveals the lack of merit in defendant's complaint. It is clear the prosecutor was arguing his opinion based on the evidence.

Defendant further contends that the prosecutor improperly argued facts not in evidence. He is correct as to the reference in his opening statement to defendant's rape of Mary B. and return to prison after his 1977 parole.

These matters appear to have been oversights and were never brought to the trial court's attention by an appropriate objection. There is no indication of bad faith, and the matter is clearly not of such importance that it could not have been cured by an admonition. (See *People* v. *Green, supra,* 27 Cal.3d at p. 34.)

The prosecutor may, however, have overstepped the permissible limits in arguing about defendant's use of hollow point bullets in the McDonald's shootings: "And what kind of weapon does he use—a .357 magnum, hollow point bullets. Some of you men might know the significance of the hollow point bullet, what it is capable of doing, and why you use it. You use that ammunition and that highpowered—[objection overruled]." Although there was evidence of the severe injuries suffered by the two trash collectors, defendant is correct in stating that there was no evidence presented that they were caused by hollow point bullets. The prosecutor was therefore drawing an improper inference from the injuries sustained by the victims. The error, however, is not of such significance that it could have affected the verdict.

Defendant finally complains that the prosecutor implied in final argument that he was responsible for David Garcia's death: "You heard testimony of Calvin Miller who was there and described what happened. You heard the testimony of David Garcia. He's now dead. [¶] Listen to the tape [of the telephone conversation between defendant and Evelyn Bostic]. If you want to know what Oscar Gates is like, listen to the tape of that telephone conversation he had with Evelyn Bostic. Did the Mexican show up in court today? No. They postponed it. Is the Mexican in custody? Oscar knows he's not. He's out. He's hiding because he knows I'm looking for him. That's Oscar Gates."

There was no objection at trial, and no impropriety appears. It had been stipulated that Garcia was dead. If it is true, as defendant asserts, that there was an implication that defendant killed Garcia, it is nevertheless based on the evidence. In any event, such an implication is not readily apparent.

12. *Ineffectiveness of Counsel.*

Defendant contends that he was deprived of his constitutional right to the effective assistance of counsel. To establish entitlement to relief for ineffective assistance of counsel defendant must show (1) that trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. (*People* v. *Pope, supra,* 23 Cal.3d at p. 425; *People* v. *Fosselman,*

*supra,* 33 Cal.3d at p. 584.) "[W]here the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed." (*People* v. *Pope, supra,* 23 Cal.3d at p. 425.)

Defendant claims counsel was ineffective in failing to cross-examine any of the prosecution witnesses who testified as to defendant's other crimes. He concedes that counsel had a tactical reason, but argues that it was "totally without legal support and cannot be considered within the range of reasonable competence." During closing argument defense counsel stated: "Oscar Gates is yet to be tried for the murder in Los Angeles. We did not cross-examine. We presented no evidence, and I did that with a purpose. And that purpose is to show you that he is not on trial here for that murder. He will go on trial in Los Angeles County for that case. If the jury finds him guilty there, it is that jury's responsibility to determine if he dies for that or not; but that is Los Angeles County's responsibility. And that is not what you are being asked to decide, whether he should be punished for it up here."

We are not persuaded that counsel's reasoning was unsound or fell below the range of legal competence. Cross-examination of the prosecution witnesses might well have resulted in placing even greater emphasis on the other-crimes evidence. Given the heinousness of the mortuary beatings, counsel could reasonably have concluded that to focus on the mortuary crimes would tend to enhance this evidence. Counsel could very wisely have concluded that the less said, the better.

Defendant faults counsel for eliciting prejudicial testimony from his sister in response to questions about defendant's abnormal behavior when he came to visit in 1978. Counsel asked: "Was there anything else that you could tell? You say that he seemed abnormal about either what he said or the way he said it. Was there something abnormal about the way he said things?" "A. Well, he would say some things like, I would tell him, 'Don't get in anything.' And he told me he wouldn't get into anything, you know. And I would tell him that I heard that the State of California had the death penalty and, you know, how it is when you get into something like that. He said he had many friends, and he didn't do anything wrong. You know, and all, that he told me, 'But you know, death doesn't really mean anything because everybody had to die.' And if he died, he wouldn't want me to cry because, if I did, I couldn't make an end [*sic*] where I don't know."

Defendant contends this evidence would not have come out had counsel properly interviewed his witnesses. Anyone who has ever tried a case knows that does not necessarily follow. To accept defendant's reasoning would be

to hold trial counsel responsible for all the direct examination answers of his witnesses. It is not uncommon for even the most carefully prepared witness to give an occasional surprise answer. Counsel's question in this case did not necessarily call for the answer that was given.

Defendant further faults counsel for failing to present evidence of his belief that the Stevensons owed him money. There was no need to repeat such evidence; it was introduced at the guilt phase, and counsel argued it in the penalty phase.

## III. CONCLUSION

Defendant was fairly tried, convicted and sentenced. Whether viewed singly or cumulatively, no error in this case warrants reversal. Defendant is not entitled to review for disparity of sentence under federal due process or equal protection principles. (See *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1285-1288 [232 Cal.Rptr. 849, 729 P.2d 115].)

The judgment is affirmed.

Lucas, C. J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.**—I concur in affirming the judgment of guilt and the finding of special circumstances. However, I dissent from the affirmance of the penalty, for I cannot agree that the errors committed by the trial court in instructing the jury were harmless under any standard. In my view they seriously misled—or at best, confused—a jury desperately seeking guidance.

The judge began his penalty phase instructions with commendable prescience. He somewhat anticipated our opinion in *People* v. *Brown* (1985) 40 Cal.3d 512 [230 Cal.Rptr. 834, 726 P.2d 516], by using the permissive "may" instead of the mandatory "shall" in describing the duty of the jurors if they found aggravating outweighed mitigating factors. So far so good. But unfortunately it was all downhill from there.

When the jury asked for explanation of the use of "may" by the judge, he lapsed into a discourse on the discredited "shall" language of the misguided statute. Included in his circular remarks was the statement that "the statute, itself, says it in a mandatory way. It does say 'shall.' " It is difficult to understand why the judge, after giving a permissive instruction, felt it necessary to advise the jury about the text of a statute that he purported not to be strictly following. The result could only be confusing to the jurors.

To compound the confusion, the judge advised the jury that "if you conclude that the factors in aggravation outweigh those in mitigation, then *you select this punishment.* If you find the factors in mitigation outweigh those in aggravation, you select the *other punishment.*" (Italics added.) Obviously "this punishment" could only be understood as referring to death, the "other punishment"—the lesser—to life without possibility of parole.

If that were not sufficiently confusing to the jurors, the court's response to a specific query from a juror provided an additional dimension in tilting the result to death. A juror asked, "Regardless of which way it goes, whether it's—if we find, say, predominantly in one direction, do we still have the option to vote the opposite way?" A simple affirmative answer would have been both correct and adequate. Instead the judge repeated, for apparent emphasis, his misleading statement that "If the factors in aggravation outweigh those in mitigation, *you vote one way.* If the factors in mitigation outweigh the factors in aggravation, you vote *another way.*" (Italics added.) Again, there can be only one conceivable explanation for the distinction between "one way"—death—and "another way"—life without possibility of parole. In effect he told the jury, despite his previous equivocal assurances to the contrary, that the weighing process would itself determine with certainty the jury's conclusion as to penalty. This, as we should well know, is not a requirement of the law. Aggravating circumstances may be overwhelming, as they frequently are in capital cases, but the jury may nevertheless choose to impose a sentence of life without possibility of parole.

In my opinion, the foregoing errors in instructions would be amply sufficient to justify reversal of the penalty. But there was more.

In response to a question from the jury about how to consider various aspects of the penalty phase, the court proceeded to reiterate the general aggravating and the mitigating factors listed in the statute. The court then inexplicably described the specific aggravating factors shown by the evidence, but omitted any reference to mitigating evidence. This was highly improper and contrary to the admonition expressed by this court in *People v. Cook* (1983) 33 Cal.3d 400, 408 [189 Cal.Rptr. 159, 658 P.2d 86]: "a trial court that chooses to comment to the jury must be extremely careful to exercise its power 'with wisdom and restraint and with a view to protecting the rights of the defendant.' " In addition, the exclusion of any mention of mitigating evidence, while emphasizing to the jury the details of aggravating evidence, runs afoul of admonitions by the United States Supreme Court in *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989, 98 S.Ct. 2954], and *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 114 [71 L.Ed.2d 1, 11, 102 S.Ct. 869]. This was clearly prejudicial error.

The omission of any discussion of mitigating evidence was not inadvertent, for in commenting on defendant's motion for review of the sentence of death, the judge categorically declared there were "no factors in mitigation." He appears to have been under the impression that because the defense testimony "was merely as to his background" and not related to the circumstances of the crime, no mitigation had been offered for consideration. This, of course, is contrary to United States Supreme Court decisions in *Lockett, Eddings,* and more recently *Hitchcock* v. *Dugger* (1987) __ U.S. __ [95 L.Ed.2d 347, 107 S.Ct. 1821] and *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669].

For the foregoing reasons I believe we are compelled to grant the defendant a new penalty trial.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied December 17, 1987, and the opinion was modified to read as printed above.