* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.
[EDITORS' NOTE: REVIEW GRANTED BY THE CALIFORNIA SUPREME COURT; PURSUANT TO RULES 976, 976.1 and 979 OF THE CALIFORNIA RULES OF COURT, THIS OPINION IS NOT CERTIFIED FOR PUBLICATION. THE SHADED TEXT BELOW REPRESENTS THE ORIGINAL OPINION AND IS PROVIDED FOR REFERENCE PURPOSES ONLY.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 281 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 282 
A jury convicted defendant Aaron Christopher Hargrove of first-degree murder, street terrorism, possession of a firearm by a convicted felon, and associated enhancements. He was sentenced to a total determinate term of 13 years 8 months, plus a consecutive indeterminate term of 25 years to life.[1] Defendant appeals, claiming the following errors: (1) The trial court's instructions on three of the prosecutor's four independent *Page 283 
theories of first degree murder were legally incorrect; (2) the trial court erroneously admitted expert testimony as to defendant's mental state, and (3) the prosecutor unlawfully exercised peremptory challenges against two prospective jurors based on a group bias. We disagree with defendant's arguments and affirm the judgment in its entirety.
 FACTS
The victim, Kenneth Williams, lived with his fiancée and three children, his fiancée's five sisters and their children, the fiancé of one of the sisters, his fiancée's mother, and a family friend in a home near an apartment complex in Stockton. At approximately 3:00 a.m., September 13, 1997, Ricky Cobbs, a member of a street gang known as the East Coast Crips, appeared at the house, intoxicated. He claimed he was looking for his gun, and began ransacking the house to find it. Cobbs accused Williams of stealing his gun, but Williams denied doing so.
Some of the occupants convinced Cobbs to go outside to look in the car, and then locked him out of the house. Cobbs responded by kicking the door and throwing objects off the porch. He left before the police arrived.
Later that morning, Cobbs met with a number of other gang members, perhaps as many as nine or ten including defendant, and complained about Williams taking his gun. The group eventually left in four cars and drove to the apartment complex near Williams's home. There, they encountered James "Scratch" Hopkins and asked if he knew of Cobbs's gun. Hopkins became scared and retrieved a gun for himself, a semiautomatic "Mac 11." This angered defendant, who opened a gun case and showed Hopkins he was armed with the same kind of weapon. Another man in the group was also armed. Defendant accused Hopkins of possessing Cobbs's gun. When Hopkins continued to deny having the gun, the group members asked him to show them where Williams lived.
Arriving at Williams's house at approximately 12:30 p.m., Cobbs led a portion of the group inside and found Williams. Cobbs grabbed Williams in a headlock, and Williams fell to the floor. The others beat and kicked Williams, who tried to cover his face. Cobbs demanded Williams give him his gun, but Williams screamed he did not have it. As the group stopped beating Williams and turned to leave, defendant entered the room, pointing a gun at Williams on the floor. One of the gang members stepped in front of defendant and told him not to do it. Defendant lowered the gun momentarily, but then stepped over Williams, raised the gun again and shot Williams in the chest. Authorities at a nearby hospital pronounced Williams dead at 1:13 p.m. that afternoon. *Page 284 
 DISCUSSION I Jury Instructions on Different Theories of First Degree Murder
Both parties acknowledge the trial court instructed the jury on four independent legal theories to reach a verdict of first-degree murder. The first three theories were felony murder (attempted robbery), conspiracy to commit robbery resulting in murder, and murder as a natural and probable consequence of the target crime defendant intended to aid. The fourth theory was for willful, deliberate, and premeditated murder.
Defendant claims instructions on the first three theories were legally incorrect. He acknowledges the fourth theory was a valid theory, but asserts we must reverse under the rule of People v. Guiton (1993)4 Cal.4th 1116 and Griffin v. United States (1991) 502 U.S. 46 [116 L.Ed.2d 371] because we cannot determine whether the jury relied on one of the allegedly erroneous theories.
Guiton applies when a jury is instructed with valid and invalid theories to support a verdict and the jury issues a general verdict in which it does not announce the particular theory on which it rested its decision. Under Guiton, "[i]f the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground. But if the inadequacy is legal, not merely factual, that is, when the facts do not state a crime under the applicable statute, as in [People v. Green (1980) 27 Cal.3d 1], the Green
rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground." (People v.Guiton, supra, 4 Cal.4th at p. 1129, fn. omitted.)
The failure to instruct the jury properly on different theories supporting a charged crime may be classified as a "legal" as opposed to a "factual" error. (People v. Tinajero (1993) 19 Cal.App.4th 1541, 1551.) We thus review the instructions given for each of the three challenged theories. We conclude the trial court committed no error.
A. Felony Murder (Attempted Robbery) Instruction
The court instructed on the elements of robbery as part of instructing on the crime of felony murder. However, the court did not instruct on a *Page 285 
common law claim-of-right defense sought by defendant. Because both defendant and Cobbs were prohibited from owning or possessing a firearm as a matter of law, the court determined defendant was not entitled to raise the defense here.
Defendant claims he was entitled to assert the claim-of-right defense on the following grounds: (1) even if defendant mistakenly believed Cobbs was entitled to retrieve his gun, defendant still could claim the defense because he subjectively believed Cobbs was seeking his own gun; and (2) in any event, because Cobbs, as a matter of law, lacked felonious intent in trying to retrieve his own gun, by logic, defendant acting to aid and assist Cobbs also lacked specific intent. We disagree.
"Although an intent to steal may ordinarily be inferred when one person takes the property of another, particularly if he takes it by force, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery. It has long been the rule in this state and generally throughout the country that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent. A belief that the property taken belongs to the taker, or that he had a right to retake goods sold is sufficient to preclude felonious intent. Felonious intent exists only if the actor intends to take the property of another without believing in good faith that he has a right or claim to it." (People v. Tufunga
(1999) 21 Cal.4th 935, 943, internal quotation marks and citations omitted.)
Tufunga, however, does not extend the claim-of-right defense to principals other than the property's owner. Indeed, we are aware of no reported case law extending the claim-of-right defense to principals other than the owner, and defendant cites to none. To discourage forcible or violent self-help as a remedy (People v. Tufunga, supra, 21 Cal.4th at p. 953), we interpret the defense narrowly and strictly.
The trial court acknowledged there was no evidence showing defendant knew Cobbs could not lawfully possess a gun. The evidence suggested defendant believed he was merely assisting Cobbs recover Cobbs' gun. To qualify for the defense, however, defendant must prove he held some type of legal claim or right to the property. The taker must hold a "belief that the property taken belongs to the taker. . . ." (People v. Tufunga,supra, 21 Cal.4th at p. 1143, italics added.) Thus, by its own terms, the defense cannot be extended beyond the taker to one who aids and abets the taker. The two simply hold different intents.
At all times, defendant claimed the gun he sought was Cobbs's gun, not his gun. No matter what defendant believed about Cobbs's right to obtain the *Page 286 
gun, defendant was clearly of the mind to enter the house in order to take or assist in taking by force the property of another — the sine qua non of the crime of robbery. Although Cobbs may have entered the home to retake his own property, the same cannot be said of defendant. He had no claim of right to the gun.
Furthermore, no public policy supports extending the defense to this situation. Cobbs's request to defendant for assistance certainly did not equate to granting defendant a legal right of ownership in Cobbs's gun. Were we to hold otherwise, we would be condoning the very behavior which occurred here — a group of nine or ten gang members forcing their way into a home, attempting to rob the victim by brutally beating and kicking the victim, and eventually killing him, and all this based on one of their member's assertion of a belief in his right to certain property allegedly in the victim's possession.
Moreover, any belief in a right or claim to the property must be bona fide and in good faith. (People v. Tufunga, supra, 21 Cal.4th at p. 947.) State law prohibited defendant, a prior convicted felon, from owning, possessing, or having custody of a firearm. (Pen. Code, §12021, subd. (a)(1).) It is impossible for one who knows he is prohibited by law from owning or possessing a firearm to believe in good faith he has any kind of legal right or claim to own or possess another's firearm, no matter who possesses it. Defendant's counsel admitted at oral argument defendant surely knew he was prohibited from owning or possessing a firearm. Thus, defendant did not hold a bona fide belief he himself had a right or claim to Cobbs's gun, and thus could not take advantage of the claim-of-right defense.
Defendant also argues he was entitled to the defense because Cobbs was entitled to the defense. Cobbs, however, was not entitled to the defense. "[T]he [claim-of-right] defense is not available where the claim of right to the property is founded in a `notoriously illegal' transaction. (People v. Hendricks (1988) 44 Cal.3d 635, 642 [fee collection for prostitution services]; People v. Gates (1987)43 Cal.3d 1168, 1182 [distribution of proceeds from forgery ring]; see also People v. Johnson (1991) 233 Cal.App.3d 425, 457-458 [payment for a drug deal].)" (People v. Tufunga, supra, 21 Cal.4th at p. 954, fn. 5, italics added.)
The Attorney General argues the attempted robbery and murder here at issue are a notoriously illegal transaction voiding any claim of right held by Cobbs. This argument misses the point. The exception to the defense applies where the claim of a property right "is founded in," arises from, or is based *Page 287 
upon, a notoriously illegal transaction. Cobbs did not base his claim of right to his gun on this robbery. The "transaction" through which Cobbs must base his claim is the one by which he obtained ownership of the gun.
Defendant, however, also misses the point. He argues Cobbs's possession of a firearm is not the type of notoriously illegal activity which precludes the claim-of-right defense. Unlike the forgery at issue in Gates or the prostitution at issue in Hendricks, possessing a gun is not inherently illegal, defendant asserts, and thus not notoriously illegal.
The trial court determined Cobbs suffered a sustained juvenile petition in 1989 when he was 18 years old for willfully and maliciously discharging a firearm. (See Pen. Code, § 246.) As a result, Penal Code section 12021, subdivision (e), prohibited Cobbs from owning, possessing or having in his custody or control any firearm until the age of 30 years. The court noted Cobbs was either 26 or 27 years old when he committed this crime, and thus had no legal right to own or possess a gun at that time.
In the context of the "notoriously illegal transaction" exception, notorious does not refer to defendant's opinion regarding the degree of social revulsion towards unlawfully possessing a firearm as compared with prostitution. Rather, "notorious" refers to something being "generally known." (Black's Law Dict. (7th ed. 1999) p. 1090.) There can be no dispute it is generally known by the public, and specifically known by Cobbs and defendant (as counsel admitted at oral argument), adjudicated juveniles and convicted felons have no legal right to own or possess a firearm.
The very fact Cobbs had possession of a gun sometime before he lost it and sometime near the time he attacked Williams, i.e., at a time when it was unlawful for him to possess a gun, rendered the manner in which he came into ownership or possession of the gun a notoriously illegal "transaction" or activity. "As a matter of law, one cannot have a good faith belief that he has a right to property when that `right' is rooted in a notoriously illegal transaction." (People v. Gates, supra, 43 Cal.3d at p. 1182.) Thus, Cobbs had no right to assert the claim-of-right defense for himself. Since Cobbs was not entitled to the defense, the premise of defendant's argument is eliminated.
Even assuming it may be appropriate to extend the defense to those who aid and abet the taker in some situations, this is not such a situation. Even though a claim-of-right instruction was not given here, there is an adequate basis in the record to determine the verdict of first degree murder was actually based on another valid ground — willful, deliberate, and premeditated murder. (See part I, section D, infra;People v. Guiton, supra, 4 Cal.4th at p. 1129.) *Page 288 
For these reasons, we conclude the trial court did not err in refusing to give a claim-of-right instruction as a defense to this theory of murder.
B. Conspiracy to Commit Robbery Instruction
The court instructed the jury it could find defendant guilty of first degree murder if it determined defendant conspired with Cobbs to rob Williams and if the murder was the natural and probable consequence of that conspiracy. Defendant challenges this instruction under the same claim-of-right arguments he raised against the instructions in support of the felony-murder theory. For the same reasons expressed above, we conclude the trial court did not err in refusing to give a claim-of-right instruction as a defense to the conspiracy to commit robbery theory.
C. Aider and Abettor Instruction
The prosecution's third theory supporting a murder claim was to argue defendant aided and abetted in the crimes of assault and battery, and the victim's murder was a natural and probable consequence of that assault and battery. Defendant argues these instructions were erroneous because murder is not a natural and probable consequence of simple assault or simple battery as a matter of law unless the assault is committed with a deadly weapon or by means of force likely to produce great bodily injury, citing People v. Prettyman (1996) 14 Cal.4th 248, 267.Prettyman does not so hold.
An aider and abettor "is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets." (People v. Croy (1985)41 Cal.3d 1, 12, fn. 5.) In Prettyman, the Supreme Court refined and applied the test to determine whether an aider and abettor is guilty of a crime committed by another principal that is more serious than the target crime. Nowhere did the Supreme Court determine murder cannot as a matter of law be a reasonably foreseeable, or "natural and probable" consequence of assault and battery. The language from Prettyman relied upon by defendant is merely an example of how the test could apply on the facts of that case. (See People v. Prettyman, supra, 14 Cal.4th at p. 267.)
Under the Prettyman formula, the "jury must decide whether the defendant (1) with knowledge of the confederate's unlawful purpose, and (2) with the intent of committing, encouraging, or facilitating the commission of any target crime(s), (3) aided, promoted, encouraged, or instigated the commission of the target crime(s); whether (4) the defendant's confederate committed an offense other than the target crime(s); and whether (5) the offense *Page 289 
committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated." (People v. Prettyman, supra, 14 Cal.4th at p. 267, italics in original.)
"The determination whether a particular criminal act was a natural and probable consequence of another criminal act aided and abetted by a defendant requires application of an objective rather than subjective test. This does not mean that the issue is to be considered in the abstract as a question of law. Rather, the issue is a factual questionto be resolved by the jury in light of all of the circumstancessurrounding the incident." (People v. Nguyen (1993) 21 Cal.App.4th 518, 531, citations omitted, italics added.)
We can certainly foresee situations such as this where murder is a natural and probable consequence of assault and battery. Here, a criminal street gang stormed a house. Two of the gang members, including defendant, were carrying firearms. Defendant had already displayed his firearm to the group moments before they entered the house. The group members did not commit just a single assault. Rather, a number of them repeatedly and viciously hit, punched and kicked the helpless victim over a period of minutes.
In light of all of these circumstances, a reasonable person could determine murder was a natural and probable consequence of this particular attack. We thus conclude the trial court did not err as a matter of law by instructing the jury murder could be a natural and probable consequence of the assault and battery committed against Williams.
D. Evidence in Record Showing Verdict Based on Valid Ground
Even if we determined the trial court's instructions regarding any of the previous theories were incorrect, we still would not reverse.Guiton directs us to affirm the judgment even though a legal error occurs where there is "a basis in the record to find that the verdict was actually based on a valid ground." (People v. Guiton, supra, 4 Cal.4th at p. 1129, fn. omitted; Cal. Const., art. VI, § 13.) Such is the case here.
As part of a negotiated plea which required him to testify truthfully before the jury in this case, accomplice Samuel Grim described the murder to the jury in detail. A member of the East Coast Crips, Grim participated in Williams's beating. After the attack concluded, it was Grim who saw defendant first raise his gun, and it was Grim who told defendant not to do it. Grim saw defendant lower the gun momentarily, then raise the gun again and shoot Williams. *Page 290 
Although Grim's credibility was challenged, Grim's testimony was not contradicted at trial. The testimony eliminates any question defendant murdered Williams willfully and deliberately. Regarding proof of premeditation, Grim's testimony showed defendant actually paused to lower his gun. He then changed his mind and raised the gun again. As a gang member, defendant obviously was angered by the alleged offense to Cobbs, his fellow gang member — angry enough to bring a gun in violation of law and to use it. Furthermore, he used the gun when there was no threat to him. The victim was lying helpless on the floor, the other gang members were in the process of leaving the victim's room, and Grim in fact attempted to stop defendant from using the gun. The killing was nothing less than an assassination or execution. Indeed, the jury received instructions only on murder, not manslaughter.
Thus, we have facts demonstrating an apparent planning by defendant to kill Williams and an apparent motive from which the jury could infer reflection and weighing of considerations rather than unconsidered or rash impulse hastily executed. The facts also demonstrate the manner of killing was so particular defendant must have acted on a preconceived design to kill in a particular way. These are the types of facts from which a jury can infer premeditation. (People v. Anderson (1968)70 Cal.2d 15, 27.)
That defendant's premeditation may have transpired in a very short period of time is of no moment. "[A] murder is of the first degree no matter how quickly the act of killing follows the ultimate formation of the intention if that intention has been reached with deliberation and premeditation. . . . The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." (People v. Thomas (1945) 25 Cal.2d 880, 900.)
So compelling is Grim's testimony it provides a sound basis for us confidently to conclude the verdict was actually based on the fourth of the prosecution's theories supporting the charge of murder: defendant killed Williams willfully, deliberately, and with premeditation.
Because we determine the court did not err in its instructions on the prosecution's theories of first-degree murder, and because we can also determine from the record the verdict was actually based on a valid ground, on the specifics of this case we conclude there are no erroneous matters and theories of law on which we could find the jury impermissibly reached its verdict. *Page 291 
 II Admissibility of Expert Testimony
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 III Prosecution's Peremptory Challenges to Prospective Jurors
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 DISPOSITION
The judgment is affirmed. The trial court is directed to amend the abstract of judgment consistent with footnote 1 of this opinion and to forward a certified copy of the amended abstract to the Department of Corrections.
I concur:
DAVIS, Acting P.J.
I concur in the result:
CALLAHAN, J.
[1] The trial court imposed but stayed a one-year enhancement pursuant to Penal Code section 12022, subdivision (a)(1). This term is not reflected in the abstract of judgment, which we will order amended. *Page 292