Filed 6/17/14  P. v. Quillen CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C071297 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF113853) |
| v. | |
| CHARLES CAMERON QUILLIN, | |
| Defendant and Appellant. | |

Defendant Charles Cameron Quillin shot his friend Matthew Smith to death following an argument they had in defendant's trailer home.  A jury found defendant guilty of first degree murder and found he had personally used a firearm, resulting in a sentence of 50 years to life in prison.

On appeal, defendant raises four instructional issues.  Rejecting these arguments, we affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

A

*The Prosecution's Case*

Defendant and the victim Smith had been friends since about seventh or eighth grade.  At the time defendant shot Smith,  defendant was 21 and Smith was 22.

Smith's girlfriend was Jennifer Vietto.  According to Vietto, Smith had a gun that he carried around on him all the time, and in the past defendant and Smith had jokingly shot Smiths's guns (he had more than one) in the open together.   About a month before the shooting, defendant and Smith had a "play fight" or a "friendly fade" (meaning a friendly fight) in which defendant's "nose was busted open" and Smith had a "small bruise."  Since then, defendant and Smith had exchanged more than 190 text messages and telephoned each other about 85 times.

The night of August 26, 2011, Smith and Vietto picked up Vietto's friend, Kaitlyn Jordan, and the three of them went to defendant's trailer in West Sacramento sometime after 11:30 p.m..  Twenty minutes later, a friend of defendant's, Tim Wales, came over, too.  All five of them were in the living room playing a drinking game that involved taking shots in rapid succession.  For some unknown reason, defendant decided he did not want to drink anymore, became mad, and went outside.  Sometime after defendant came back inside, Jordan vomited.  Defendant became "very upset" and told her that she "better clean up that throw up."  He "had a really mean look on his face and was fidgeting a lot."  Smith asked defendant, "[Y]ou're going to end the party off one girl?"  There was tension between defendant and Smith.  Wales told defendant, "Charlie, bro, like, you're around people [who] love you.  We're not trying to do anything against you."  After Jordan and Vietto left, defendant and Smith argued about whether Jordan could come back.  Defendant sounded agitated and upset.  Smith was "trying to talk to him and calm him down . . . ."  When Vietto came back, defendant and Smith were still arguing about Jordan.  Vietto asked defendant why he did not like Jordan and said there was

2

nothing wrong with her. Vietto and defendant were angry with each other, so Smith broke up their argument by telling her to go to the car. At that point, defendant pulled a gun out of his front pocket and pointed it at Smith's head. Smith responded, "I don't care what he has, just go to the car." By this time, Jordan and Vietto had come back inside the trailer, and defendant said, "[G]et her out of here. Both of you. Get her and get the fuck out of here now." Defendant and Smith were within two feet of each other.

According to Wales, there was not a physical fight between defendant and Smith. He never saw Smith "take a swing" at defendant, but Smith "might have" because "there was a period of time where [Wales] . . . [was] kind of turned. . . ." "They weren't fighting and they weren't standing there and they weren't swinging at each other or trying to bump chests." They were "[s]tepping up to each other" with "[a] little bit" of "[r]aised voices." Right after that, Wales heard a gunshot and saw Smith "falling back slowly." Wales "[go]t out of there" and heard three more shots.

According to Jordan (who was watching from Vietto's car), Smith was "talking with his hands" and "trying to get his point across" about eight feet away from defendant. "And then all of a sudden, [defendant] just stood up and shot [Smith]" while Smith was facing him. There were three or four gunshots. After the first shot, Smith's head went backwards. After the second shot, Smith "went to the ground." There was one more shot when Smith's body went down.

Wales ran to Vietto's car, and Vietto, Wales, and Jordan drove to a nearby motel and called 911. Police showed up, and all of them went back to the trailer. Vietto saw defendant walk up to the trailer with a big alcohol bottle in hand. Police handcuffed him. When police asked where the gun was, defendant pointed to a location 160 feet away from the fence of the trailer. When he was booked into the jail and told it was for attempted murder, defendant responded as follows: " 'So he's still alive? Oh, thank God.' " He added, " 'How can he still be alive, I put five holes in him?' "

3

When police arrived, Smith still had a pulse and was breathing. He had a small gun in his pocket. He was taken to the hospital and died of multiple gunshot wounds. He was shot five times, twice in the head.

B

*The Defense*

Defendant testified that he and Smith were friends who hung out daily. Smith was a Sureño gang member who had been to prison. Defendant had often seen Smith with a gun.

The day before the shooting, Smith had asked defendant for some bullets because Smith had "just dumped all of his bullets on some [Norteño ]." (Defendant had given Smith bullets in the past.) Defendant told Smith he did not have enough bullets to give him, so Smith got "real mad," and defendant hung up the telephone on Smith. The next day (before Smith and the others came to defendant's trailer to drink), defendant gave Smith two bullets.

At defendant's trailer, defendant took shots of alcohol with Smith, Vietto, and Jordan and then he switched to beer. Wales showed up later and joined the drinking. Defendant went outside and sat on the porch and heard the others inside saying his name. He told them he could hear them talking about him, to which Smith responded with attitude, "ain't no one fucking talking about you."

Around this time, Jordan threw up. Defendant got her a towel for her to clean up, but she "just tossed it on the ground." Defendant went into the kitchen. Defendant told Jordan she "ha[d] to clean it up better than that" and then told her "just leave." When Jordan and Vietto were leaving, defendant told Vietto not to bring Jordan back. Smith, who was also in the kitchen, as was Wales, asked defendant (who was sitting in a chair), " 'why are you trippin'?' " Vietto came in and started yelling at defendant, "why are you fucking acting like that to my friend?" Defendant told her, "you could leave too." Smith

4

told defendant, "why are you getting on my girl like that" and then told Vietto to leave. Defendant was "scared of him at this point."

Defendant "pull[ed] the gun out of [his] pocket, and then . . . s[a]t back down." Vietto told Smith, "he's pulling his gun out," to which Smith responded, "I don't give a fuck what he has." Smith told Vietto to go back outside, and she did. Smith asked defendant, "what the fuck are you doing," and then Smith "came charging at [defendant]." Defendant stood up and told Smith, "don't come near me," but Smith "just kept coming." Smith grabbed defendant "[a]round [his] neck, shoulder area."

Defendant "pulled [the gun] up" and Smith "pushed [defendant] back, and that's when [defendant] shot." Defendant then grabbed the bottle of alcohol, took the gun with him, and called his dad because he was scared. He asked his dad to lie and "tell people that he [defendant] was there." His dad told him to turn himself in.

## DISCUSSION

### I

*The Trial Court Did Not Have To Instruct That Voluntary Intoxication*
*Could Be Used To Negate Premeditation And Deliberation, And Defense*
*Counsel Was Not Ineffective For Failing To Request That Pinpoint Instruction*

Defendant contends the court violated his due process right to present a complete defense by failing to instruct that voluntary intoxication could be used to negate premeditation and deliberation. We hold defendant has forfeited the issue by failing to request that pinpoint instruction and defendant's backup ineffective assistance argument fails because there was no prejudice.

The court instructed on voluntary intoxication as follows:

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the specific intent to kill.

5

"A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating liquor, drug, or other substance knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect. You may not consider evidence of involuntary [*sic*] intoxication for any other purpose."

Evidence of voluntary intoxication is "admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (Pen. Code, § 29.4, subd. (b).) The trial court does not have a duty to instruct sua sponte that the jury could consider voluntary intoxication evidence with respect to the issue whether the defendant premeditated and deliberated. "As [the California Supreme Court] explained in *People v. Saille* (1991) 54 Cal.3d 1103, 1120 . . . , an instruction on voluntary intoxication, explaining how evidence of a defendant's voluntary intoxication affects the determination whether defendant had the mental states required for the offenses charged, is a form of pinpoint instruction that the trial court is not required to give in the absence of a request. [Citation.]" (*People v. Bolden* (2002) 29 Cal.4th 515, 559.)

In *Saille*, the defendant was convicted of the first degree murder of one victim and the attempted murder of another victim. (*People v. Saille*, *supra*, 54 Cal.3d at p. 1107.) "[T]he instructions given (CALJIC No. 4.21) related voluntary intoxication only to the question of whether defendant had the specific intent to kill." (*Saille*, at p. 1117.) The defendant contended that "the trial court erred in failing to instruct sua sponte that the jury should consider his voluntary intoxication in determining whether he had premeditated and deliberated the murder." (*Ibid.*) The Supreme Court held that an instruction that relates the evidence of the defendant's intoxication to an element of a crime, such as premeditation and deliberation, is a pinpoint instruction, which the defense must request, and not a " 'general principle of law,' " upon which a trial court must instruct sua sponte. (*Id*. at p. 1120.) It concluded that the trial court did not err. (*Ibid.*)

6

Here, defense counsel did not request a pinpoint instruction relating voluntary intoxication to premeditation and deliberation. Following *Saille*, we hold that the trial court did not err in failing to give such an instruction that covered premeditation and deliberation.

We turn then to defendant's backup argument, which is that defense counsel was ineffective for failing to request a pinpoint instruction relating the voluntary intoxication instruction to premeditation and deliberation. We reject defendant's argument because there was no prejudice. (See *People v. Gates* (1987) 43 Cal.3d 1168, 1183 [to show ineffective assistance of counsel, a defendant must show that counsel failed to act as a reasonably competent attorney, and that prejudice resulted (i.e., a reasonable probability that defendant would have fared better had counsel not failed).]

The jury was properly instructed on voluntary intoxication as it related to defendant's ability to form the specific intent to kill. By finding defendant guilty of murder, the jury rejected the theory that he was so intoxicated that he did not form the specific intent to kill. It is inconceivable that the jury would have found that he could form the specific intent to commit the crime but determine, based on the same intoxication, evidence that he was too intoxicated to premeditate and deliberate. (See *People v. Cain* (1995) 10 Cal.4th 1, 45 [inconceivable that jury would find that the defendant did not form specific intent to rape based on intoxication when it determined that the same intoxication evidence did not negate the specific intent to kill].) Furthermore, right after the shooting, defendant was able to discard his firearm about 160 feet away from the fence of the trailer and call his dad to ask him to be his alibi. These were not the actions of a man who was too intoxicated to premeditate and deliberate a murder just a few minutes earlier. Therefore, there was no prejudice in defense counsel's failure to request the pinpoint instruction.

7

## II

*The Trial Court Correctly Declined To Give Instructions On Self-Defense*

*And Imperfect Self-Defense When Initially Requested Because There*

*Was Insufficient Evidence Supporting Those Instructions At That Time*

Defendant contends the trial court violated his federal constitutional right to present a defense and right against self-incrimination when it refused to instruct on self-defense and imperfect self-defense unless he testified. We disagree. The court's initial decision refusing these instructions was correct because at the time the court made its decision, there was insufficient evidence to support those instructions. Further, defendant is factually wrong that the court premised its initial decision on defendant's refusal to testify.

## A

*Factual And Procedural Background Relating To Giving*

*Self-Defense And Imperfect Self-Defense Instructions*

After the People's case-in-chief, the trial court said it would not instruct on self-defense and imperfect self-defense because those instructions "all point out that the defendant has to believe that he is in imminent peril and that a reasonable person . . . in the same situation would come to that same conclusion. [¶] We have evidence as to the second issue, but I haven't heard any evidence addressing the first issue. [¶] So at this point I don't believe that those instructions are appropriate." "[T]o establish . . . those defenses, there has to be evidence that the defendant subjectively believed that he was in imminent danger of great bodily injury. [¶] We simply have no evidence of such a subjective belief. [¶] The only comment we have from the defendant is the comment he made during booking that he shot the decedent five times and the decedent was a Norteño (*sic*). [¶] Nothing in that statement suggests that he believed that he had no recourse but to fire his weapon because he was in imminent danger. [¶] I don't find any evidence, at least at this point in the case, that would allow me to give [the instructions]."

8

After the court's ruling, defendant ended up testifying. He testified he pulled his gun out of his pocket because Smith "was getting real loud and [defendant] thought [Smith] was going to hurt [him]." Despite the gun, Smith "came charging at [defendant], and [defendant] stood up and . . . told him, don't come near me, and he just kept coming." Smith grabbed defendant around his "neck, shoulder area" and pushed defendant back. Then defendant shot Smith, and Smith fell on top of him and landed on his lap.

After the defense rested, the court instructed on self-defense and imperfect self-defense.

B

*Principles Relating To Self-Defense And Imperfect Self-Defense*

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation and footnote omitted.] To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable. [Citations.] As the Legislature has stated, '[T]he circumstances must be sufficient to excite the fears of a reasonable person . . . .' [Citations.] Moreover, for either perfect or imperfect self-defense, the fear must be of imminent harm. 'Fear of future harm--no matter how great the fear and no matter how great the likelihood of the harm--will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' [Citation.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

C

*The Court Correctly Did Not Initially Instruct*

*On Self-Defense And Imperfect Self-Defense*

Here, the court was correct that at the time defendant initially requested self-defense and imperfect self-defense instructions, there was insufficient evidence to

9

support them. As the court explained, at the time defense counsel initially requested the self-defense and imperfect self-defense instructions, the evidence was that defendant and Smith had gotten into an argument, defendant pointed a gun at Smith, and then fired five times. There was no eyewitness testimony, statement at the time of the crime, or some behavior that manifested his intent explaining why defendant pulled the trigger.

What this evidence showed was that defendant was mad, angry or agitated throughout the evening, becoming more so after Jordan vomited. Smith tried to diffuse the situation, and when they were within feet of one another, they "[s]tepp[ed] up to each other" with "[a] little bit" of "[r]aised voices" and Smith made some hand gestures to get his point across. But there was no evidence at this point that Smith swung at defendant, threatened him, or did anything that caused defendant to feel like he was in fear "of *imminent* danger to life or great bodily injury." (*People v. Humphrey*, *supra*, 13 Cal.4th at p. 1082.)

What defendant points to is the following background evidence about Smith: according to Vietto, Smith had a gun that night, carried a gun on him "at all times," and in the past defendant and Smith had jokingly shot their guns in the open together; and about a month before the shooting, defendant and Smith had a "play fight" in which defendant's "nose was busted open" and Smith had a "small bruise." The problem with this evidence is defendant points to no evidence at the time the court rejected the instructions that defendant knew that Smith carried a gun at all times or he knew that defendant had a gun on him that night and there was no indication why the play fight would have made defendant think Smith would be violent here.

In summary, at the time the court ruled it would not give the self-defense or imperfect self-defense instructions, there was insufficient evidence that defendant was in fear "of *imminent* danger to life or great bodily injury." (*People v. Humphrey*, *supra*, 13 Cal.4th at p. 1082.) The court was correct to refuse the instructions at this time.

Nevertheless, defendant continues that the court's ruling violated his due process right to present a defense and his right against compulsory self-incrimination because "the court's ruling improperly conditioned [his] constitutional right to present a defense on his surrender of his right not to testify." Not so. As the court explained, defendant's subjective intent could be proved not just by defendant's own testimony: "Sometimes we have eyewitness testimony that gives us a window into what the defendant was thinking, something he says at the very time that the crime occurred, or some behavior that's obvious it manifests what his intent is . . . ." If defendant had evidence of any of these things, he could have proffered it. Simply because he did not and therefore instead chose to testify to show his subjective fear of imminent bodily injury, the court cannot be found to have violated defendant's constitutional rights.

## III

*The Court Correctly Instructed That Self-Defense May Not Be Contrived*

*And Correctly Did Not Instruct That The Initial Aggressor Has The Right To Self-*

*Defense When His Opponent Responds With Sudden And Deadly Force*

Defendant contends the court erred by instructing with CALCRIM No. 3472 that the right to self-defense may not be contrived and by failing to instruct with CALCRIM No. 3471 that an initial aggressor has the right to self-defense when his opponent responds with sudden and deadly force. We take each instruction in turn, explaining why the court's instructions were correct.

## A

*The Court Correctly Instructed Self-Defense May Not Be Contrived*

*(CALCRIM No. 3472)*

The court instructed with CALCRIM No. 3472 that "[a] person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." There was sufficient evidence to support this instruction. According to the People's evidence, Vietto and defendant were angry with each other, so

11

Smith broke up their argument by telling her to go to the car. At that point, defendant pulled a gun out of his front pocket and pointed it at Smith's head. Smith responded, "I don't' care what he has, just go to the car." By this time, Jordan also had come back inside the trailer, and defendant said, "[G]et her out of here. Both of you. Get her and get the fuck out of here now." Defendant and Smith were within two feet of each other. According to Wales, defendant and Smith were "[s]tepping up to each other" with "[a] little bit" of "[r]aised voices." According to Jordan, Smith was "talking with his hands" and "trying to get his point across" from about eight feet away from defendant. From this evidence, a jury could have concluded that defendant provoked the fight or quarrel (the "[s]tepping up to each other" with "[a] little bit" of "[r]aised voices") to create an excuse to use his gun on Smith. Before defendant took out his gun, Smith and defendant had simply exchanged words. As soon as defendant took out the gun, the stepping up to one another began, quickly escalating into defendant shooting Smith to death.

B

*The Court Correctly Did Not Instruct That The Initial Aggressor Has The Right To Self-Defense When His Opponent Responds With Sudden And Deadly Force*

*(CALCRIM No. 3471)*

The court did not instruct with (nor was it asked to instruct with)[1] CALCRIM No. 3471 that "[a] person who (engages in mutual combat/ [or who] starts a fight) has a right to self-defense only if: [¶] 1. (He/She) actually and in good faith tried to stop fighting; [¶] [AND] [¶] 2. (He/She) indicated, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wanted to stop fighting and that (he/she) had stopped fighting(;/.) [¶] <Give element 3 in cases of mutual combat.>

---

[1] Despite defendant's failure to request this instruction, we review defendant's claim of instructional error because he claims the error in not giving this instruction affected his substantial rights under Penal Code section 1259.

12

[¶] [AND [¶] 3. (He/She) gave (his/her) opponent a chance to stop fighting.] [¶] If the defendant meets these requirements, (he/she) then had a right to self-defense if the opponent continued to fight. [¶] [However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting].] [¶] [A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.]"

The court correctly did not give this instruction because it had no evidentiary support. The part of the instruction that defendant focuses on for appeal instructs that a defendant regains the right of self-defense if he uses only nondeadly force and his opponent responds with sudden and deadly force that defendant could not withdraw from the fight. But here, even under defendant's version of facts, Smith did not act with deadly force that would have given defendant the right to defend himself with deadly force. Defendant and Smith had been arguing about Vietto and Jordan. Defendant was "scared of [Smith] at this point." Defendant then "pull[ed] the gun out of [his] pocket, and then . . . s[a]t back down." Smith asked defendant "what the fuck are you doing" and then Smith "came charging at [defendant]." Defendant stood up and told Smith, "don't come near me," but Smith "just kept coming" at him with his hands in front of him. Smith grabbed defendant "[a]round [his] neck, shoulder area." Defendant "pulled [the gun] up" and Smith "pushed [defendant] back, and that's when [defendant] shot." Defendant knew that Smith had a gun, but defendant did not see Smith put his hands in his pockets or pull out his gun.

Given that it was defendant who pulled out his gun and Smith only charged at defendant with, at most, his hands around defendant's "neck, shoulder area," never taking

13

out his gun, there was insufficient evidence that Smith was the one who responded with deadly force from which defendant could not withdraw, thus justifying him shooting Smith to death.

## IV

*The Court's Instruction Regarding Jurors Submitting Their Own Questions Was Correct, And Defendant Forfeited His Contention That The Court Conducted An Inadequate Inquiry Of Certain Jurors*

In his last argument, defendant contends the court failed to properly admonish the jurors when instructing them they could submit questions to ask the witnesses and failed to properly inquire when some jurors were no longer functioning in the role of impartial judges of the facts, as defendant claims was evidenced by the questions they asked. We disagree that the court's instruction was error, and we find his argument regarding the court's inquiry into juror impartiality forfeited.

## A

*The Instruction*

The instruction that defendant contends was flawed was the following, which the court gave right before the first witness testified:

"Folks, before we hear from the first witness, I want to talk about a procedure I use here in court that you don't necessarily see on TV. I let jurors ask questions of the witnesses.

"Now, everything in a trial is formal, so you don't get to just shout out your questions. The questions have to be written out so that I get the chance to preview the questions and make sure that they call from admissible evidence and, frankly, more importantly, to make sure there's not some other witness with more information on that subject who is going to be coming in and talking about it because if so, there's no reason to ask that question.

14

"In my experience more than ninety percent of the time jurors pose questions to the witnesses they are great questions. They cover subjects that either weren't discussed in sufficient detail or subjects that were simply missed by the attorneys.

"Sometimes, because the attorneys know more about the case than any of us, they assume that we know things we don't know, so they forget to ask questions based on those assumptions.

"You need to know everything of importance in this case, so if there's anything in the case that you are unsure of, that you think a witness may know about, don't hesitate to write out a question.

"I mean, the worst thing that can happen is I will tell you 'Sorry. We are not going to ask that question of this particular witness.'

"I will tell you if you asked a question that I think, based on what the attorneys tell me, can be more directly discussed by some other witness, I will simply tell you there's another witness who is going to come in and talk about that very subject.

"But most of the time your questions will be posed to the witness so that you will have all of the information that you need to make the important decisions that the attorneys have identified as the issues in this particular case, so I encourage you to ask questions if, indeed, you have questions.

"Now, the way that we do this is after the attorneys finish their questioning, I will turn to you, and I will ask you if you have any questions.

"Now, it may be that you were anticipating the attorneys would ask your question so you haven't written it out. That's fine. Don't worry. Just let us know that you have a question, and we will wait patiently while you write out the question.

"The bailiff will then collect everyone's questions. I will meet the attorneys at bench side, and I will review the questions with them. I will tell the attorneys whether the questions can be asked.

"If the questions are appropriate, then I will let the attorneys ask those questions. Most of the time I wouldn't ask the questions. They would ask the questions, but at least in that way you will get your questions answered."

B

*The Court's Instruction Was Not An Abuse Of Discretion*

Defendant contends the instruction was an abuse of discretion because it "did not caution jurors not to feel slighted or disappointed if his or her question was not asked, did not tell jurors not to speculate why a question was not asked or speculate what the answer might have been, and, most importantly, did not caution jurors to keep in mind in framing their questions that they were not advocates for one side or the other."

Defendant gets this language from CALCRIM No. 106 (not given in this case) which states as follows: "If, during the trial, you have a question that you believe should be asked of a witness, you may write out the question and send it to me through the bailiff. I will discuss the question with the attorneys and decide whether it may be asked. Do not feel slighted or disappointed if your question is not asked. Your question may not be asked for a variety of reasons, including the reason that the question may call for an answer that is inadmissible for legal reasons. Also, do not guess the reason your question was not asked or speculate about what the answer might have been. Always remember that you are not advocates for one side or the other in this case. You are impartial judges of the facts."

Contrary to defendant's argument, however, the court effectively addressed these concerns, which we determine by looking at the instructions as a whole. (See *People v. Smithey* (1999) 20 Cal.4th 936, 963.) With respect to cautioning the jurors not to feel slighted or disappointed if their questions were not asked, the court said the functional equivalent by instructing "the worst thing that can happen is I will tell you 'Sorry. We are not going to ask that question of this particular witness.' " With respect to not speculating why a question was refused or not speculating what the answer might have

16

been, the court had just explained in an earlier instruction in the context of a question that was asked but an objection sustained, "do not guess what the answer might have been or why I ruled as I did." There is no reason to believe that the jurors would not have applied this same logic or instruction to a question they asked that the court refused to read. Finally, with respect to cautioning jurors to keep in mind in framing their questions that they were not advocates for one side or the other, the court had already instructed "[k]eep an open mind throughout the entire trial" and "[d]o not make up your mind about the verdict or any other issue until after you have discussed the case with the other jurors during deliberations" and "not [to] let bias, sympathy, prejudice, or public opinion influence your decision."

C

*By Failing To Object, Defendant Has Forfeited His Claim That Five Of The Jurors'*

*Questions Showed Juror Impartiality, Triggering The Court's Duty To Investigate*

Pointing to five questions certain jurors submitted, defendant contends for the first time that these questions showed these jurors were no longer functioning in the role of impartial judges of the facts.[2] As such, he argues, the court had a duty to investigate and

---

[2] The five questions, summarized, were as follows: (1) Would you say that one of the shots possibly would have incapacitated the victim and for sure two of them, meaning that the third, fourth, and fifth shots "were to guarantee a death of the victim" and occurred while the victim was motionless? (this question was given); (2) In your expert opinion, whether someone is a novice or power drinker, on drugs, male or female, would you say one to two bullets to the head would create the same effect, i.e. incapacitation, immobility, motionless, no longer aggressive? (this question was given); (3) Would you say it is plausible with a suspect standing shooting from the waist, the first shot entered the left eye of the victim while standing, now the victim is falling back and against the wall, now victim is sitting on the ground motionless when the suspect stood over the victim and fired three more rounds into the top of his head and right ear? (this question was given); (4) Didn't defendant have a gun out to begin with and planned to use it? (this question was not given) (5) Given defendant's admitted association with the Peckerwood gang and having met with Barry 1,000 times, did shooting, as defendant called him, Wetto-Matt seem like no big deal? (this question was not given).

17

decide whether to conduct a hearing to determine whether there was good cause to discharge these jurors.  By failing to raise the issue in the trial court, defendant has forfeited this issue on appeal.  (*People v. Panah* (2005) 35 Cal.4th 395, 480 [claim of juror bias caused by conduct of defendant's family members was forfeited by failure to request any action in trial court].)

DISPOSITION

The judgment is affirmed.


      ROBIE      , J.


We concur:


      RAYE      , P. J.


      NICHOLSON      , J.